Michael A. Kalish (MK-8118)
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOSEPH KOURY, | ) | |
| | ) | No. 08 cv 5409 (SAS) |
| Defendant, | ) | |
| | ) | **ECF CASE** |
| v. | ) | |
| | ) | **AFFIDAVIT OF** |
| XCELLENCE, INC., d/b/a XACT, | ) | **MICHAEL A. KALISH** |
| | ) | **IN SUPPORT OF** |
| Defendant. | ) | **MOTION TO DISMISS** |
| | ) | |

STATE OF NEW YORK     )
                                       ) ss.:
COUNTY OF NEW YORK   )

MICHAEL A. KALISH, duly sworn, deposes and says:

1.    I am a member of the firm Epstein Becker & Green, P.C., attorneys for

Defendant Xcellence, Inc., d/b/a XACT ("Defendant") in the above-captioned action. I submit

this affidavit to provide the Court with copies of documents cited in Defendant's Memorandum

in Support of Its Motion to Dismiss.

2.    Upon information and belief and following a diligent inquiry, annexed as

Exhibit A is a true and correct copy of the Complaint in this matter.

3.    Upon information and belief and following a diligent inquiry, annexed as

Exhibit B is a true and correct copy of a document entitled "Subordination Agreement" dated

June 12, 2006.

NY:2714866v1

4.    Upon information and belief and following a diligent inquiry, annexed as Exhibit C is a true and correct copy of a document entitled "Subordination Agreement" dated December 10, 2007.

5.    Pursuant to the Individual Rules of Judge Shira A. Scheindlin, I certify that on July 1, 2008, counsel for the parties exchanged pre-motion letters.

_____
Michael A. Kalish

Sworn to before me this
2nd day of July, 2008

_____
Notary Public

FRANCES R. MANY-HARRIS
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01MA6069562
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES FEB. 4, 20 10

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JOSEPH KOURY,

                     Plaintiff,

       -against-

XCELLENCE, INC., d/b/a XACT,

                  Defendant.

---

Index No. 106546/08

**SUMMONS**

To the above-named defendant:

         **You are hereby summoned** and required to serve upon Plaintiff's attorney an answer to the complaint in this action within twenty (20) days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after service is complete if this Summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

         The basis of the venue designated is § 503(a), which permits the Plaintiff to designate any county when none of the parties reside in the state.

Dated: New York, New York
        May 12, 2008

Respectfully submitted,

BAKER BOTTS L.L.P.

By: _____
      Seth T. Taube
      Maureen P. Reid

30 Rockefeller Plaza
New York, New York 10112-4498
(212) 408-2500

Attorneys for Plaintiff
Joseph Koury

NEW YORK
COUNTY CLERK'S OFFICE

MAY 12 2008

NOT COMPARED
WITH COPY FILE

NY01:204642.1

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JOSEPH KOURY,

                  Plaintiff,

       -against-

XCELLENCE, INC., d/b/a XACT,

                Defendant.

---

Index No. 106546/08

**COMPLAINT**

Plaintiff Joseph Koury, by his attorneys, Baker Botts L.L.P., complaining of Defendant Xcellence, Inc., d/b/a Xact, hereby alleges as follows:

### PRELIMINARY STATEMENT

1.    Defendant is unjustifiably withholding monthly payments due to Plaintiff Joseph Koury in exchange for the sale of Mr. Koury's reproduction services business to Defendant. Due to the restrictive covenant included in the purchase agreement at Defendant's insistence, Mr. Koury is currently substantially reliant upon payments from Defendant to support himself and his family. Defendant cannot have it both ways.

2.    In the face of unreasonable and fabricated demands by Defendant regarding alleged violations of the restrictive covenant, and in order to resolve the matter quickly and minimize any financial hardship to him through Defendant's unjustified withholding of his monthly payments under the agreement, Mr. Koury quit a job he took following the sale of his business -- a job in which he had every right to take under the terms of the parties agreement. He also agreed to a reduction in the total amount due to him under the purchase agreement.

3.    In return for Mr. Koury's generous cooperation, Defendant (1) gave him false representations on several occasions; (2) has ceased payments to him during two successive subordination periods less than one month apart; (3) refuses to provide Mr. Koury with those payments not made during the subordination periods; and (4) hid its true financial situation from Mr. Koury when he was asked to sign a second subordination agreement.

4.    Defendant has also breached its fiduciary duties to Plaintiff, in that, upon information and belief, Defendant is and has been insolvent for several months, has made misrepresentations to its lenders, and has failed to take the actions necessary to protect Mr. Koury as a creditor of Defendant.

5.    Mr. Koury is seeking a declaration that the Defendant has breached the purchase agreement and that the restrictive covenant is void. Plaintiff seeks payment of all monies due him, with interest.

## PARTIES

6.    Plaintiff Joseph Koury is an individual residing at 18 Club Way, Red Bank, New Jersey 07701. Mr. Koury was a member of Accurate Repro, LLC, a reproduction services company, until he sold his interest in that company to Xcellence, Inc., d/b/a Xact, on or about May 6, 2006.

7.    Defendant Xcellence, Inc., d/b/a Xact, is a corporation formed under the laws of Missouri with its principal place of business located at 5800 Foxridge Drive, Suite 406, Mission, Kansas 66202. Xcellence, Inc., d/b/a Xact, is in the business of reproduction services.

## JURISDICTION AND VENUE

8.     Under 11 of the Purchase Agreement, the laws of the State of New York govern all rights and obligations under the Purchase Agreement, as well as the enforcement, validity and performance of the Purchase Agreement.

9.     Defendant regularly transacts business in the State of New York, and particularly in New York County, and, thus, has subjected itself to jurisdiction in this Court.

## FACTUAL BACKGROUND

### A.    The Purchase Agreement

10.     Prior to May 3, 2006, Mr. Koury was a member of Accurate Repro, LLC.

11.     On May 3, 2006, Xcellence, Inc., d/b/a Xact (hereinafter "Xact") and Mr. Koury entered into a Purchase Agreement in order to terminate Mr. Koury's business relationship with Accurate Repro and in order for Xact to purchase all of Mr. Koury's rights, title and interest in Accurate Repro, LLC. *See* Ex. 1.

12.     Under the Purchase Agreement, Xact agreed to pay Mr. Koury a purchase price of $1,350,000 (the "Purchase Price") in exchange for Mr. Koury's membership interest in Accurate Repro. *See id.* at ¶ 3.

13.     The Purchase Price was to be paid on a deferred basis over a sixty (60) month period, together with interest on the unpaid portion at the rate of 9% per year. *See id.* The schedule of payments was attached as an exhibit to the Purchase Agreement. Xact agreed to pay sixty (60) consecutive monthly installments of $28,023.78 each, with the first payment to be made on May 3, 2006, and the last payment to be made on or before April 3, 2011. *See id.*

14.     The Purchase Agreement contains the following provision:

> "The rights of Koury hereunder, including the right to receive payment of the Purchase Price and interest thereon, shall be

subordinate to the rights and claims of all holders of indebtedness for borrowed money of [Accurate Repro] and/or of Xact. In this regard, Koury agrees that the subordination provisions set forth in Exhibit C hereto shall govern Koury's rights hereunder. Further, Koury agrees to enter into any further subordination agreement that may be required by any lender of [Accurate Repro] and/or Xact." *See id.* at ¶ 4.

15.    Mr. Koury entered into a subordination agreement subsequent to the Purchase

Agreement.

16.    In paragraph 7(b), Mr. Koury agreed that:

"for a period of three (3) years after the Closing, Koury will not, directly or indirectly, as owner, shareholder, member, partner, consultant, co-venturer or otherwise, own, manage, operate, control, be employed by, participate in, or be connected in any manner with, the ownership, management, operation or control of any business that is in competition with Xact's and/or the [Accurate Repro's] business in Markets served by Xact and/or the [Accurate Repro], ..." *See id.* at ¶ 7(b).

17.    "Markets" were listed on Exhibit D to the Purchase Agreement and did not

include New Jersey. *See* Ex. 1, Ex. D.

18.    In addition to compensating Mr. Koury for selling his interest in Accurate Repro,

the Purchase Price included paying for Mr. Koury's agreement not to compete with Xact.

## B.    Subsequent Non-Prohibited Employment

19.    Following the Purchase Agreement, Mr. Koury had conversations with Robert

Polus, Chairman and Chief Executive Officer of Xact, regarding potential job opportunities for

Mr. Koury. Mr. Koury consulted with Polus with regard to one particular position offered to

him in Philadelphia, a market prohibited under the Purchase Agreement. Polus suggested that

Xact would be willing to allow Mr. Koury to take the position in return for a reduction in the

Purchase Price. Ultimately Mr. Koury turned down that offer, as well as other lucrative offers

from companies serving markets prohibited under the Purchase Agreement.

20.     On or about July 2, 2007, Mr. Koury began working for Everest Document Solutions ("Everest"), a reproduction services company headquarters in Newark, New Jersey; a market not prohibited under the Purchase Agreement. Mr. Koury was open and honest with regard to his new position and, based on previous discussions he had had with Polus, Mr. Koury believed his new job was acceptable to Xact.

C.      **Xact's Unjustified Excuses for Failure to Comply with the Purchase Agreement and Its Breach of Fiduciary Duty**

1.      **Invented Violation of Restrictive Covenant**

21.     On or about July 30, 2007, Xact informed Mr. Koury that it considered his employment at Everest a breach of paragraph 7(b) of the Purchase Agreement, despite the fact that Mr. Koury was not working in any prohibited markets and had received assurances from Polus that such a job would be acceptable to Xact.

22.     Xact claimed that it was entitled to terminate payments to Mr. Koury under paragraph 3 of the Purchase Agreement based on Mr. Koury's alleged breach of the restrictive covenant.

23.     Xact initially demanded $300,000 from Mr. Koury. Xact claimed unspecified alleged damages from Mr. Koury's employment at Everest, as well as damages stemming from allegedly undisclosed liabilities (specifically, copy machines that Accurate Repro had leased), and damages relating to an EEOC claim by a former employee of Xact. Curiously, Xact also claimed damages from competitive activities by Mr. Koury relating to Mr. Koury's "brother's litigation support firm in Philadelphia," despite the fact that Mr. Koury does not have a brother and he never engaged in any competitive activities in Philadelphia (or anywhere else).

24.     While recognizing the fact that Xact's claims were meritless because his employment at Everest in New Jersey was not in violation of the Purchase Agreement and,

regardless, he had not engaged in any competitive activities, Mr. Koury sought to avoid potential litigation and loss of payments due to him under the Purchase Agreement. Therefore, Mr. Koury quit his job with Everest on or about August 2, 2007.

25.    During his mere one month employment with Everest, Mr. Koury did not make any business contacts or solicit any business for Everest. Mr. Koury did not engage in any activity whatsoever that could be considered competitive or hurtful to Xact. Therefore, Xact did not suffer any damages as a result of Mr. Koury's brief employment with Everest.

26.    In response to a request by Xact, Mr. Koury even provided an affidavit attesting to his departure from Everest and offered Xact an opportunity to speak with his former supervisor at Everest. *See* Ex. 2.

27.    Mr. Koury went even further in order to resolve the dispute and offered to reduce the principal amount due to him under the Purchase Agreement if Xact continued his monthly payments.

28.    The parties negotiated for several weeks until they eventually settled the matter on or about September 29, 2007, by entering into "Amendment No. 1 to Purchase Agreement." *See* Ex. 3. Pursuant to the Amendment, Mr. Koury agreed to a $190,193.40 reduction in principal due to him under the Purchase Agreement. The Purchase Price was therefore amended to be $1,159,806.60.

## 2.    First Bank Subordination

29.    Just days after the execution of the Amendment, on or about October 3, 2007, Mr. Koury received notification from Commerce Bank (in a letter dated before the Amendment) that Xact was in default under one or more agreements between Xact and Commerce and that

Mr. Koury's payments from Xact were being subordinated. *See* Ex. 4. Xact's counsel had advised Mr. Koury that he was not aware of any subordination on September 29, 2007.

30.    Xact's last payment to Mr. Koury prior to that subordination was on July 3, 2007.

31.    Xact indicated it was in the process of refinancing with Marshall & Ilsley Bank ("M&I") and advised Mr. Koury that his monthly payments would resume following the completion of the refinancing. However, Xact told Mr. Koury that it would not be providing him with the monthly payments that were not paid to him during the subordination restriction period (i.e., all payments between, and including, August 3, 2007 and when Xact resumes payments).

32.    Because the Purchase Agreement contains an end date for payment of the Purchase Price (April 3, 2011), it is clear that the parties' intention was that all missed payments due to subordination would be paid when subordination is resolved.

3.    **The Second Bank Subordination and Xact's Insolvency**

33.    In December 2007, pursuant to the Purchase Agreement, Defendant insisted on Mr. Koury executing a new subordination agreement ("Second SA") as part of its refinancing with M&I, and refused to pay Mr. Koury until it was executed.

34.    The draft Second SA entitled Mr. Koury to examine Defendant's financial condition before executing the document. However, when Mr. Koury demanded such records on December 11, 2007, Defendant suspiciously refused Mr. Koury access to its financials and instead opted to remove the language from the Second SA that would permit such inspection.

35.    Forced to sign the Second SA to receive any payment, Mr. Koury executed the Second SA at the end of December 2007. Thereafter, Mr. Koury received two payments, on December 21, 2007, and January 21, 2008.

36.    Barely two months after the renewed payments began, Defendant failed to pay the February 2008 payment in breach of the Purchase Agreement.

37.    On February 21, 2008, Mr. Koury notified Defendant of the missed payment. Only then was Mr. Koury notified that on January 24, 2008, a few weeks after the Second SA was signed, his payments had again been subordinated.

38.    Thus, Xact went into covenant default on its refinancing agreement with M&I less than one month after the agreement was signed. Upon information and belief, Xact failed to provide M&I with accurate financial statements in procuring its loan, which would explain the guarded refusal to allow Mr. Koury access to those documents during the negotiation of the Second SA.

39.    Therefore, Xact was apparently insolvent beginning at least December 2007 when it sought refinancing from M&I and obtained such refinancing based upon misinformation and by hiding its true financial condition.

40.    Such insolvency triggered certain fiduciary duties to Xact's creditors -- Mr. Koury being one of those creditors. Beginning at least in December 2007, Xact had and still has a fiduciary duty to Mr. Koury to take whatever steps are necessary to pay him by liquidating its assets or selling its business. Xact breached that fiduciary duty.

41.    In fact, Polus told Mr. Koury during initial negotiations in 2006 and again in May 2007, that the entire business would be sold by the third quarter of 2007.

8

42.    Mr. Koury has received no payments since July 2007, except for the two payments on December 21, 2007 and January 21, 2008. Defendant has reiterated its position that it is not obligated to pay the missed payments due to the subordination.

43.    By reason of Defendant's position, Mr. Koury is being deprived of at least tens of thousands of dollars and perhaps hundreds of thousands of dollars, depending on when Xact decides to resume payments to Mr. Koury. While awaiting his payments to begin again, Mr. Koury is unable to earn sufficient income to support his family.

44.    Defendant has admitted that the business Defendant bought was profitable, and that it was the pre-existing business of Defendant that was struggling.

45.    Xact is effectively treating the subordination as a waiver by Mr. Koury, releasing Xact from its obligation to pay him the Purchase Price. Such a position is without foundation. Xact should not be permitted to retain Mr. Koury's business at a substantially reduced price, while restraining him from working in the industry at the same time.

## 4.    False Representations Regarding the Payment of Taxes

46.    During the negotiation of the Purchase Agreement, Polus informed Mr. Koury that Xact would be responsible for all taxes associated with the transaction to purchase Accurate Repro as Accurate Repro's retained earnings would become Xact's and, thus, Xact should pay the taxes on those earnings.

47.    Nevertheless, despite assurances to the contrary, Xact refused to pay Mr. Koury's taxes for his 2006 K-1, which amounted to $117,000.

9

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT
### (Breach of Contract)

48.    Plaintiff repeats and realleges each and every allegation above with the same force and effect as if set forth fully herein.

49.    The Purchase Agreement sets forth valid and enforceable obligations of Defendant.

50.    Plaintiff duly performed all of his obligations under the Purchase Agreement.

51.    Defendant breached its obligations under the Purchase Agreement by its continued failure to pay Plaintiff the proceeds of the business he sold to Defendant, including those payments missed during the first subordination period.

52.    Plaintiff has suffered damages as a direct and proximate result of Defendant's breaches, and is entitled to recover those damages in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT
### (Declaratory Judgment)

53.    Plaintiff repeats and realleges each and every allegation above with the same force and effect as if set forth fully herein.

54.    Plaintiffs seek a declaration that Defendant is in violation of the Purchase Agreement by failing to pay Plaintiff monthly payments since July 3, 2007 (with limited exception), and, thus, because of Defendant's breach, Plaintiff is no longer restrained from pursuing and obtaining employment in markets competitive to Defendant's business.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT
### (Breach of Fiduciary Duty)

55.    Plaintiff repeats and realleges each and every allegation above with the same force and effect as if set forth fully herein.

56.    A fiduciary relationship between Defendant and Plaintiff existed when Defendant became insolvent in or around December 2007, and still exists today.

57.    Defendant breached that fiduciary duty to Mr. Koury by failing to take the steps necessary to pay Mr. Koury the money he is owed by selling Xact's assets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    Damages in the amount of all accelerated sums due under the Purchase Agreement, plus the loss he suffered as a result of Defendant's conduct, plus prejudgment interest thereon;

B.    Punitive damages in an amount to be determined at trial;

C.    Declaratory judgment be entered that Defendant is in violation of the Purchase Agreement and Plaintiff is no longer restrained by the employment restriction in the Purchase Agreement;

D.    Disbursements, costs and expenses, including reasonable attorneys' fees; and

E.    Any other relief that the Court finds just and reasonable.

Dated: New York, New York
       May 12, 2008

Respectfully submitted,

BAKER BOTTS L.L.P.

By: _____
       Seth T. Taube
       Maureen P. Reid

30 Rockefeller Plaza
New York, New York  10112-4498
(212) 408-2500

Attorneys for Plaintiff
Joseph Koury

EXHIBIT 1

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "agreement") is made and entered into this ___ day of May, 2006 by and among Joseph E. Koury ("Koury"), Xcellence, Inc., a Missouri corporation ("Xact") and Accurate Repro, LLC, a Missouri limited liability company (the "Company").

RECITALS:

A.    Koury and Xact, as the members of the Company have entered into an Operating Agreement, dated January 3, 2000 (the "Operating Agreement") respecting the Company.

B.    Koury and the Company have entered into an Employment Agreement, dated January 3, 2000 (the "Employment Agreement").

C.    Koury, the Company and Xact desire to terminate Koury's business relationships with the Company through the Company's purchase of Koury's membership interest in the Company and the termination of Koury's employment with the Company.

AGREEMENTS:

1.    (a)    Unless otherwise defined herein, all capitalized terms shall have the same definition as set forth in the Operating Agreement.

(b)    The closing of the purchase of Koury's Membership Interest in the Company (as provided in Section 2 below) and the other transactions contemplated herein (the "Closing") shall take place on May 3, 2006 at 4:00 p.m. at the offices of the Company or at such earlier time as Xact shall notify Koury. At the Closing, the parties shall execute such instruments and documents as may be appropriate to carry out the purpose and intent of this Agreement.

(c)    Pending Closing, the Company and Xact intend to perform such due diligence efforts as they deem appropriate, and in connection therewith, Koury shall cooperate in all respects with the Company and Xact.

(d)    In the event the Company or Xact determine that they or either of them deem it imprudent to proceed with the purchase of Koury's Membership Interest and the other transactions provided for herein, they shall have the right to terminate this Agreement by notice to Koury given prior to 4:00 p.m. on May 1, 2006.

2.    At the Closing, Koury shall assign, sell and transfer to the Company all of Koury's right, title and interest in, to and under Koury's Membership Interest in the Company. Koury hereby represents and warrants to the Company and to Xact that (a) Koury owns the Membership Interest transferred hereby free and clear of all liens, claims and encumbrances, (b) the Company is acquiring such Membership Interest from Koury free and clear of all liens, claims and encumbrances, (c) the Company has no liabilities or obligations, direct or indirect,

contingent or liquidated, other than (w) liabilities which in the aggregate do not exceed $10,000, (x) those set forth on the Company's balance sheet, dated March 31, 2006 attached hereto as Exhibit A, except as disclosed in writing by Koury to Xact, (y) liabilities described on Exhibit B hereto, and (z) those arising from circumstances disclosed in writing by Koury to Xact; (d) the Company is not in violation of and has not violated any law, rule, regulation or order applicable to the Company, except as has been disclosed in writing by Koury to Xact, (e) Koury has full right, power and authority to enter into and perform this agreement and his entry into and performance of this agreement does not violate any law, rule, regulation, order, contract, agreement or commitment applicable to Koury or to the Company and (f) he has disclosed to Xact any and all information that would be material to a purchaser of Koury's Membership Interest, as provided herein. The foregoing representations and warranties shall be true as of the Closing, and by his Closing of this Agreement, Koury shall be deemed to have so represented and warranted to the Company and Xact. The parties agree that, for purposes of this agreement, no information or knowledge which Koury has concerning the Company shall, solely by reason of the fact that Koury has such information or knowledge, be deemed to be within the knowledge of the Company.

3.    At the Closing, the Company shall accept the aforementioned assignment, sale and transfer of Koury's Membership Interest and, in exchange therefor, the Company agrees to pay $1,350,000 (the "Purchase Price"). The Purchase Price shall be payable on a deferred basis over a sixty (60) month period, together with interest on the unpaid portion at the rate of 9% per annum, a schedule of which his attached hereto as Exhibit E. Accordingly, the Company shall pay sixty (60) consecutive monthly installments of $28,023.78 each, with the first such payment to be made on May 3, 2006 and the last such payment to be made on April 3, 2011; provided, however, in the event there shall be an Exit Event, the unpaid portion of the Purchase Price shall be payable within five (5) days after the occurrence of such Exit Event; provided further, in the event Koury materially violates any provision of Section 7(a) of this Agreement or violates in any respect any provision of Section 7(b) or Section 7(c) of this Agreement, the Company shall be excused from making any further payments of the Purchase Price (and interest thereon), and its obligation to make such further payments shall be extinguished and of no further force or effect (it being understood and agreed that such extinguishment of the Company's obligation to pay the remainder of the Purchase Price shall not be the sole or exclusive remedy available to the Company for any such violation, and the Company shall have such other remedies at law or in equity as may be available to the Company with respect to any such violation). For purposes hereof, an "Exit Event" shall mean (a) the sale of all or substantially all of the assets of the Company or (b) the sale of 51% or more of the Membership Interest in the Company by Xact other than a sale or transfer to an entity controlled by Xact. Xact hereby guarantees the Company's obligations under this Section 3.

4.    The rights of Koury hereunder, including the right to receive payment of the Purchase Price and interest thereon, shall be subordinate to the rights and claims of all holders of indebtedness for borrowed money of the Company and/or of Xact. In this regard, Koury agrees that the subordination provisions set forth in Exhibit C hereto shall govern Koury's rights hereunder. Further, Koury agrees to enter into any further subordination agreement that may be required by any lender of the Company and/or Xact.



5.    Koury and the Company agree that at the Closing, Koury's employment with the Company shall automatically terminate. At Closing, Koury shall deliver to the Company all Company credit cards, keys, telephones, access cards, computers, documents (whether in hard copy or stored electronically on a computer, disk, cd-rom or any other means) and any other Company property, including the Mercedes 500 automobile. At the Closing, the Company shall deliver to Koury a check in an amount equal to all compensation and other amounts (net of normal withholdings) owed to Koury as of the Closing under the Employment Agreement and as a result of his being an employee of the Company. The Company agrees to reimburse Koury for all out of pocket expenses incurred by him on behalf of the Company and as provided in the Employment Agreement. The Company will continue to provide health benefits to Koury and his family until the Purchase Price has been paid.

6.    [Not Used]

7.    (a)    Following Closing, Koury agrees that he will not disclose any Confidential Information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever. As used herein "Confidential Information" shall mean information that is owned by or licensed to, and of value to, the Company and/or Xact and is treated as confidential by the Company and/or Xact, including, but not limited to, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans or financial information, product plans, lists of actual or potential customers or suppliers, future business plans, business strategies, and advertising or marketing campaigns and related information. Confidential Information shall not include any information that (a) was or becomes generally available to the public other than as a result of a disclosure by Koury, (b) was available to Koury on a non-confidential basis prior to its disclosure to Koury by the Company and/or Xact, or (c) becomes available to Koury on a non-confidential basis from a source other than the Company and/or Xact, provided that such source is not prohibited from disclosing such information by a contractual or legal obligation to the Company and/or Xact.

(b)    Koury agrees that for a period of three (3) years after the Closing, Koury will not, directly or indirectly, as owner, shareholder, member, partner, consultant, co-venturer or otherwise, own, manage, operate, control, be employed by, participate in, or be connected in any manner with, the ownership, management, operation or control of any business that is in competition with Xact's and/or the Company's business in Markets served by Xact and/or the Company, except that this provision shall not apply to Koury's ownership of up to 5% of the issued and outstanding securities of any corporation whose securities are registered under the Securities Exchange Act of 1934 and which are traded publicly on any national securities exchange. Markets are defined as the Metropolitan Statistical Areas of the cities listed on Exhibit D.

(c)    For a period of three (3) years after the Closing, Koury will not, directly or indirectly (i) entice or induce or in any manner influence any person who is an employee of the Company or Xact to leave such employment or (ii) divert or attempt to divert from doing business with the Company and/or Xact any individual, firm, corporation or other entity which on the date hereof was, or within one (1) year prior hereto had been, a customer or client of the Company and/or Xact.

(d)    Koury acknowledges and agrees that the Company's remedy at law for a breach or threatened breach of any of the provisions of this Section 7 would be inadequate and, in recognition of that fact, in the event of any such breach or threatened breach, it is agreed that, in addition to its remedy at law, the Company shall be entitled to, and Koury agrees not to oppose the Company's request for, equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available. Nothing herein contained shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threatened breach, it being recognized that a violation of this Section 7 by Koury shall extinguish the Company's obligation to make any further payments of the Purchase Price, as provided in Section 3 above.

(e)    The rights of the Company and/or Xact under this Section 7 shall be assignable, including, without limitation, in connection with a sale or transfer of the business or ownership of the Company or Xact.

8.    Koury acknowledges and agrees that the Company has no liability or obligation to him (including any right to indemnification under law or otherwise), other than as expressly provided in this agreement. Koury hereby agrees to indemnify and hold harmless the Company, its officers, employees and members (including Xact) from any and all claims, losses, liabilities, fines, assessments, penalties, obligations and costs threatened or imposed against the Company (as well as any attorney's fees or costs of investigation associated with such claims) (each, a "Loss") related to or arising out of (a) any breach of Section 7 of this agreement or the failure of any representation or warranty made by Koury in this agreement, (b) the employment of Mary Koury by the Company or the termination of her employment with the Company as contemplated in Section 17 hereof, or (c) any and all third party claims resulting from actions taken by Koury, or at his direction, on behalf of the Company or otherwise (whether or not taken in the scope of his employment) on or prior to the date hereof other than (i) certain actions taken with respect to one customer in the New York market, which actions Koury represents to the Company have been disclosed to the Company completely, truthfully and in no way misleading, and (ii) actions taken in good faith and in furtherance of the best interest of the Company; provided, however any actions taken by Koury or at his direction (but not including those actions referred to in the foregoing clause (i)) that would be a violation of any law that could result in criminal sanctions, fines or assessment to Koury, the Company or any person that has a business relationship with the Company shall in all respects be covered and included in Koury's obligation to indemnify hereunder; provided, however, notwithstanding the foregoing (x) Koury shall only be liable to the Company for legal fees incurred by the Company in connection with a claim by a third party if the Company has been found liable for damages, fines, assessments or penalties to such third party by a court of competent jurisdiction, and (y) Koury shall not be liable to the Company for consequential, special, punitive or exemplary damages incurred by the Company unless the same have been awarded to a third party as a result of a legal proceeding before a court of competent jurisdiction. Koury's obligations under this Section 8 shall be limited to the Purchase Price hereunder, $1,350,000. Koury shall not be required to indemnify for any Loss to the extent the Company receives insurance recoveries with respect to such Loss. The Company agrees that it will not exercise any right of setoff it may have with respect to its obligation to make payments of the Purchase Price under Section 3 above unless and until (1) in the case of Losses relating to claims, liabilities, fines, penalties, etc. by or to third parties, the Company has actually sustained a Loss pursuant to a settlement or plea bargaining agreement or pursuant to a

court order, judgment or verdict, and (2) in the case of a Loss resulting from a breach of Sections 8(a) and 8(b) above, when the Loss has actually been sustained by the Company.

9.    If any provision of this agreement is held to be illegal, invalid or unenforceable to any extent, (i) the legality, validity and enforceability of the remainder of this agreement shall not be affected thereby, (ii) said provision shall be modified by the court to the extent necessary to render it not illegal, invalid or unenforceable, and (iii) this agreement shall continue in full force and effect as modified and shall be enforced to the greatest extent permitted by law.

10.    Any notice, request, consent or communication pursuant to this agreement must be given in writing by (a) personal delivery, (b) expedited, recognized delivery service with proof of delivery, or (c) United States Mail, postage prepaid, certified mail, return receipt requested, sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee designates by written notice sent in accordance with this provision, and will be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein. Unless changed in accordance with the preceding sentence, the addresses for notices and deliveries given pursuant to this agreement are as follows:

> If to Koury:
>
> Joe Koury
> 18 Club Way
> Red Bank, NJ 07701

> If to the Company or Xact:
>
> Robert Polus
> Xact IDS
> 5410 West 61st Place
> Mission, Kansas 66205

> with a copy to:
>
> Sean W. Colligan
> Stinson Morrison Hecker LLP
> 1201 Walnut, Suite 2900
> Kansas City, Missouri 64106

11.    This agreement and all rights and obligations of the parties hereunder is governed by, and is to be construed and interpreted in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely within such State, including all matters of enforcement, validity and performance, and without giving effect to the principles of conflict of laws to the contrary.

12.    The parties hereto represent that in the negotiating and drafting of this agreement they have been represented by and relied upon the advice of counsel of their choice.  The parties affirm that their counsel have both had a substantial role in the drafting and negotiation of this agreement and, therefore, this agreement shall be deemed drafted by all of the parties hereto and the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this agreement or any attachment hereto.

13.    Each of the parties hereby agrees to execute and deliver such other documents or agreements and take such other actions as may reasonably be necessary or desirable for consummation of the transactions contemplated by this agreement or for the purposes of this agreement.

14.    All representations, warranties, covenants, and agreements of each of the parties will survive the consummation of the transactions contemplated in this agreement and will not be affected by any investigation by or on behalf of the other party.

15.    Nothing expressed or referred to in this agreement will be construed to give any person other than the parties to this agreement any legal or equitable right, remedy, or claim under or with respect to this agreement or any provision of this agreement. This agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this agreement and their successors and assigns.

16.    This agreement constitutes the entire understanding of the parties with respect to the subject matter hereof, including any rights the Company has with respect to the purchase of Koury's Membership Interest or the purchase price therefor.

17.    Concurrently with the Closing, Mary Koury shall have resigned and terminated her employment with the Company and provided a release of the Company from any and all claims she may have against the Company.

[The balance of this page intentionally left blank.]

6

18.    The Company agrees that, not more than thirty (30) days following the Closing, it will use its reasonable commercial efforts to cause the release of any and all personal guarantees of Koury of Company indebtedness to bank lenders and will provide Koury evidence thereof.

IN WITNESS WHEREOF, the parties have made and entered into this agreement the day and year first above written.

_____
Joseph E. Koury


XCELLENCE, INC.

_____
Robert Polus
Chairman of the Board
Xcellence, Inc.


ACCURATE REPRO, LLC

By:    Xcellence, Inc. and Joseph E. Koury, members of Accurate Repro, LLC


By:    _____
       Robert Polus
       Chairman of the Board
       Xcellence, Inc.

By:    _____
       Joseph E. Koury


Exhibit A    Company Balance Sheet
Exhibit B    Other Liabilities of the Company
Exhibit C    Form of Subordination Agreement
Exhibit D    Markets
Exhibit E    Amortization Schedule for Purchase Price

## OTHER LIABILITIES OF THE COMPANY

Wayne Dunn suit

| | | |
|---|---|---|
| Sidley Austin invoice | 11-36382 | $16,672.76 |
| Morgan Lewis invoice | 11-35810 | $ 4,246.00 |
| | 11-35993 | $ 2,870.00 |
| Port Authority | 11-33571 | $ 7,541.58 |

Error! Unknown document property name.

| Principal | 1,350,000.00 | | Number of months | 60.00 |
| Period to Start | 1 | | Payments per year | 12 |
| Annual Interest Rate | 9.00 | | | |
| Month to Start | 5 | | PAYMENT PER PERIOD | 28,023.78 |
| | | | TOTAL OF PAYMENTS | 1,681,426.77 |

| Period | Month | Year | Beginning Principal Balance | Interest Paid | Yearly Interest | Principal Paid | Yearly Principal | Remaining Principal Balance |
|---|---|---|---|---|---|---|---|---|
| 1 | 5 | 2006 | 1,350,000.00 | 10,125.00 | - | 17,898.78 | - | 1,332,101.22 |
| 2 | 6 | 2006 | 1,332,101.22 | 9,990.76 | - | 18,033.02 | - | 1,314,068.20 |
| 3 | 7 | 2006 | 1,314,068.20 | 9,855.51 | - | 18,168.27 | - | 1,295,899.93 |
| 4 | 8 | 2006 | 1,295,899.93 | 9,719.25 | - | 18,304.53 | - | 1,277,595.40 |
| 5 | 9 | 2006 | 1,277,595.40 | 9,581.97 | - | 18,441.81 | - | 1,259,153.59 |
| 6 | 10 | 2006 | 1,259,153.59 | 9,443.65 | - | 18,580.13 | - | 1,240,573.46 |
| 7 | 11 | 2006 | 1,240,573.46 | 9,304.30 | - | 18,719.48 | - | 1,221,853.98 |
| 8 | 12 | 2006 | 1,221,853.98 | 9,163.90 | 77,184.34 | 18,859.87 | - | 1,202,994.11 |
| 9 | 1 | 2007 | 1,202,994.11 | 9,022.46 | - | 19,001.32 | 147,003.89 | 1,183,992.78 |
| 10 | 2 | 2007 | 1,183,992.78 | 8,879.95 | - | 19,143.83 | - | 1,164,848.95 |
| 11 | 3 | 2007 | 1,164,848.95 | 8,736.37 | - | 19,287.41 | - | 1,145,561.54 |
| 12 | 4 | 2007 | 1,145,561.54 | 8,591.71 | - | 19,432.07 | - | 1,126,129.47 |
| 13 | 5 | 2007 | 1,126,129.47 | 8,445.97 | - | 19,577.81 | - | 1,106,551.66 |
| 14 | 6 | 2007 | 1,106,551.66 | 8,299.14 | - | 19,724.64 | - | 1,086,827.02 |
| 15 | 7 | 2007 | 1,086,827.02 | 8,151.20 | - | 19,872.58 | - | 1,066,954.44 |
| 16 | 8 | 2007 | 1,066,954.44 | 8,002.16 | - | 20,021.62 | - | 1,046,932.82 |
| 17 | 9 | 2007 | 1,046,932.82 | 7,852.00 | - | 20,171.78 | - | 1,026,761.04 |
| 18 | 10 | 2007 | 1,026,761.04 | 7,700.71 | - | 20,323.07 | - | 1,006,437.97 |
| 19 | 11 | 2007 | 1,006,437.97 | 7,548.28 | - | 20,475.49 | - | 985,962.47 |
| 20 | 12 | 2007 | 985,962.47 | 7,394.72 | 107,788.56 | 20,629.06 | - | 965,333.41 |
| 21 | 1 | 2008 | 965,333.41 | 7,240.00 | - | 20,783.78 | 237,660.70 | 944,549.63 |
| 22 | 2 | 2008 | 944,549.63 | 7,084.12 | - | 20,939.66 | - | 923,609.97 |
| 23 | 3 | 2008 | 923,609.97 | 6,927.07 | - | 21,096.70 | - | 902,513.27 |
| 24 | 4 | 2008 | 902,513.27 | 6,768.85 | - | 21,254.93 | - | 881,258.34 |
| 25 | 5 | 2008 | 881,258.34 | 6,609.44 | - | 21,414.34 | - | 859,844.00 |
| 26 | 6 | 2008 | 859,844.00 | 6,448.83 | - | 21,574.95 | - | 838,269.05 |
| 27 | 7 | 2008 | 838,269.05 | 6,287.02 | - | 21,736.76 | - | 816,532.28 |
| 28 | 8 | 2008 | 816,532.28 | 6,123.99 | - | 21,899.79 | - | 794,632.50 |
| 29 | 9 | 2008 | 794,632.50 | 5,959.74 | - | 22,064.04 | - | 772,568.46 |
| 30 | 10 | 2008 | 772,568.46 | 5,794.26 | - | 22,229.52 | - | 750,338.95 |
| 31 | 11 | 2008 | 750,338.95 | 5,627.54 | - | 22,396.24 | - | 727,942.71 |
| 32 | 12 | 2008 | 727,942.71 | 5,459.57 | 76,330.44 | 22,564.21 | 259,954.93 | 705,378.50 |
| 33 | 1 | 2009 | 705,378.50 | 5,290.34 | - | 22,733.44 | - | 682,645.06 |
| 34 | 2 | 2009 | 682,645.06 | 5,119.84 | - | 22,903.94 | - | 659,741.12 |
| 35 | 3 | 2009 | 659,741.12 | 4,948.06 | - | 23,075.72 | - | 636,665.40 |
| 36 | 4 | 2009 | 636,665.40 | 4,774.99 | - | 23,248.79 | - | 613,416.61 |
| 37 | 5 | 2009 | 613,416.61 | 4,600.62 | - | 23,423.16 | - | 589,993.45 |
| 38 | 6 | 2009 | 589,993.45 | 4,424.95 | - | 23,598.83 | - | 566,394.62 |
| 39 | 7 | 2009 | 566,394.62 | 4,247.96 | - | 23,775.82 | - | 542,618.80 |
| 40 | 8 | 2009 | 542,618.80 | 4,069.64 | - | 23,954.14 | - | 518,664.66 |
| 41 | 9 | 2009 | 518,664.66 | 3,889.98 | - | 24,133.79 | - | 494,530.87 |
| 42 | 10 | 2009 | 494,530.87 | 3,708.98 | - | 24,314.80 | - | 470,216.07 |
| 43 | 11 | 2009 | 470,216.07 | 3,526.62 | - | 24,497.16 | - | 445,718.91 |
| 44 | 12 | 2009 | 445,718.91 | 3,342.89 | 51,944.88 | 24,680.89 | - | 421,038.02 |
| 45 | 1 | 2010 | 421,038.02 | 3,157.79 | - | 24,865.99 | 284,340.47 | 396,172.03 |
| 46 | 2 | 2010 | 396,172.03 | 2,971.29 | - | 25,052.49 | - | 371,119.54 |
| 47 | 3 | 2010 | 371,119.54 | 2,783.40 | - | 25,240.38 | - | 345,879.16 |
| 48 | 4 | 2010 | 345,879.16 | 2,594.09 | - | 25,429.69 | - | 320,449.47 |
| 49 | 5 | 2010 | 320,449.47 | 2,403.37 | - | 25,620.41 | - | 294,829.06 |
| 50 | 6 | 2010 | 294,829.06 | 2,211.22 | - | 25,812.56 | - | 269,016.50 |
| 51 | 7 | 2010 | 269,016.50 | 2,017.62 | - | 26,006.16 | - | 243,010.35 |
| 52 | 8 | 2010 | 243,010.35 | 1,822.58 | - | 26,201.20 | - | 216,809.14 |
| 53 | 9 | 2010 | 216,809.14 | 1,626.07 | - | 26,397.71 | - | 190,411.43 |
| 54 | 10 | 2010 | 190,411.43 | 1,428.09 | - | 26,595.69 | - | 163,815.74 |
| 55 | 11 | 2010 | 163,815.74 | 1,228.62 | - | 26,795.16 | - | 137,020.58 |
| 56 | 12 | 2010 | 137,020.58 | 1,027.65 | 16,359.31 | 26,996.13 | - | 110,024.45 |
| 57 | 1 | 2011 | 110,024.45 | 825.18 | - | 27,198.60 | 311,013.57 | 82,825.86 |
| 58 | 2 | 2011 | 82,825.86 | 621.19 | - | 27,402.59 | - | 55,423.27 |
| 59 | 3 | 2011 | 55,423.27 | 415.67 | - | 27,608.11 | - | 27,815.17 |
| 60 | 4 | 2011 | 27,815.17 | 208.61 | 2,070.67 | 27,815.17 | - | 0.00 |
| TOTALS | | | | | 331,678.21 | | 110,024.45 | |
| | | | | | | | 1,350,000.00 | |

Accurate Repro, LLC
Balance Sheet Rollup Schedule
Balance Only
For the Period from March 1, 2006 to March 31, 2006

|  | Balance |
|---|---|
| **Assets** | |
| **Cash** | |
| 11100 - HSBC Operating Account | 333,885.13 |
| 11200 - HSBC Savings Account (Rent Deposit) | 45,609.92 |
| **Total Cash** | **379,495.05** |
| **Accounts Receivable** | |
| 12000 - Accounts Receivable - Customers | 1,083,141.91 |
| 12250 - Allowance for Doubtful Accounts | -11,122.41 |
| **Total Accounts Receivable** | **1,072,019.50** |
| **Other Receivables** | |
| 12600 - Employee receivables | |
| **Total Other Receivables** | |
| **Prepaid Expenses** | |
| 14010 - Prepaid rent | 20,462.05 |
| 14020 - Prepaid insurance | 26,248.35 |
| 14090 - Prepaid expenses - other | 27,446.53 |
| **Total Prepaid Expenses** | **74,156.93** |
| **Property and Equipment** | |
| 16110 - Furniture and fixtures | 23,660.95 |
| 16210 - Machinery and equipment | 297,524.30 |
| 16220 - Computers and office equipment | 60,400.92 |
| 16500 - Automobiles | 127,094.48 |
| 16600 - Leasehold Improvements | 10,876.81 |
| **Total property and equipment** | **519,465.46** |
| **Accumulated Depreciation** | |
| 17110 - A/D - Furniture and fixtures | -13,858.26 |
| 17210 - A/D - Machinery and equipment | -129,668.35 |
| 17220 - A/D - Computers and office equipment | -33,790.77 |
| 17500 - A/D - Automobiles | -55,223.69 |
| 17600 - A/D - Leasehold improvements | -6,217.42 |
| **Total Accumulated Depreciation** | **-238,758.49** |
| **Net Property and Equipment** | **280,690.97** |



Accurate Repro, LLC
Balance Sheet Rollup Schedule
Balance Only
For the Period from March 1, 2006 to March 31, 2006

|  | Balance |
|---|---|
| **Other Assets** | |
| 19110 · Deposits | 74,789.93 |
| **Total Other Assets** | 74,789.93 |
| **Total Assets** | 1,881,158.38 |
| | |
| **Liabilities and Stockholders' Equity** | |
| **Accounts Payable** | |
| 20100 · Accounts payable - trade | 209,435.61 |
| 20130 · Accounts payable - Xcellence, Inc. | 130,898.16 |
| **Total Accounts Payable** | 340,333.77 |
| **Accrued Expenses** | |
| 20120 · Customer Refunds Payable | 23,845.27 |
| 20150 · Stale payroll checks | 2,367.58 |
| 20160 · Accounts Payable - Other | |
| 20230 · Accrued equipment usage | 54,147.30 |
| 20250 · Accrued accounting fees | |
| 20260 · Other accrued expenses | 36,239.89 |
| 20285 · Accrued vacation / PTO | |
| 21001 · Sales Tax Payable | 29,162.41 |
| 22100 · Accrued wages | 75,951.69 |
| 22400 · Commissions payable | 33,292.26 |
| 23110 · FICA/Medicare payable - EE | -0.01 |
| 23115 · FICA/Medicare payable - ER | -0.01 |
| 23120 · Federal withholding payable | -71.56 |
| 23130 · State withholding payable | -19.01 |
| 23140 · Local withholding payable | -4.51 |
| 23170 · SUI Tax Payable | |
| 23210 · Health Insurance payable | |
| 23220 · Dental Insurance payable | |
| 23230 · Garnishments payable | |
| 23270 · Cafeteria contributions payable | |
| 23280 · 401(k) contributions payable | |
| 23310 · Health Life Insurance payable | |
| 23320 · Dental Insurance payable | |
| 23325 · ST Disability premiums payable | |
| 23330 · LT Disability premiums payable | |
| 23380 · 401(k) Match payable | |
| 26000 · Accrued local income taxes | 307.83 |
| **Total Accrued Expenses** | 255,248.40 |



Accurate Repro, LLC
Balance Sheet Rollup Schedule
Balance Only
For the Period from March 1, 2006 to March 31, 2006

| | Balance |
|---|---|
| **Line of Credit** | |
| 29310 - Line of credit - US Bank | 260,000.00 |
| 29320 - Line of credit - Xcellence | |
| | |
| Total Line of Credit with Bank | 260,000.00 |
| | |
| **Current portion of long-term debt** | |
| 25000 - Current portion of long-term debt | 9,000.00 |
| | |
| Total current portion of long-term debt | 9,000.00 |
| | |
| **Noncurrent liabilities** | |
| 29005 - Non current portion of vehicle note payable | 19,500.00 |
| 29900 - Rent Deposit | 44,381.35 |
| | |
| Total Noncurrent Liabilities | 65,881.35 |
| | |
| **Total Liabilities** | 928,463.53 |
| | |
| **Stockholders' Equity** | |
| Common stock | |
| 32100 - Common stock | 49,000.00 |
| | |
| Total common stock | 49,000.00 |
| | |
| Retained earnings | |
| 35000 - Retained earnings | 884,195.56 |
| 39000 - Current year net income | 19,499.29 |
| | |
| Total retained earnings | 903,694.85 |
| | |
| Total Liabilities and Stockholders' Equity | 1,881,158.38 |



EXHIBIT D

## MARKETS

| | |
|---|---|
| Akron, OH | Kansas City, MO |
| Atlanta, GA | Los Angeles, CA |
| Austin, TX | Miami, FL |
| Boston, MA | Minneapolis, MN |
| Chicago, IL | New York, NY |
| Cleveland, OH | Philadelphia, PA |
| Columbus, OH | Phoenix, AZ |
| Dallas, TX | San Francisco, CA |
| Denver, CO | Seattle, WA |
| Detroit, MI | St. Louis, MO |
| Houston, TX | Toledo, OH |
| Indianapolis, IN | Washington, DC |

Error! Unknown document property name.

EXHIBIT 2

## AFFIDAVIT OF JOSEPH E. KOURY

JOSEPH E. KOURY, of full age, duly sworn according to law, upon his oath deposes and says:

1.    I worked as an employee of Everest Document Solutions (EDS) from July 2 , 2007 until August 2, 2007.

2.    I terminated my employment with EDS on August 2, 2007.

3.    I have no further affiliation with EDS and have no ownership, partnership or contractual relationship with EDS or its affiliates, or with any other entity that is in competition with XACT and/or the Company's business in the Markets served by Xact and/or the Company. .

JOSEPH E. KOURY

Sworn and Subscribed to
Before me  10th  day of
October , 2007

SEAN F. BRANES

**EXHIBIT 3**

10/03/2007  3:27PM (GMT-05:00)

## AMENDMENT NO. 1 TO PURCHASE AGREEMENT

THIS AMENDMENT NO. 1 TO THE PURCHASE AGREEMENT is made and entered into this _____ day of September, 2007 by and among Joseph E. Koury ("Koury"), Xcellence, Inc., a Missouri corporation ("Xact") and Accurate Repro, LLC, a Missouri limited liability company (the "Company").

RECITALS:

A.    Koury, the Company and Xact are parties to a Purchase Agreement dated May 3, 2006 (the "Purchase Agreement").

B.    In July, 2007, Koury accepted employment with Everest Technologies Company, LLC or an affiliate thereof (the "Employment"), which Xact alleges violated the terms of Section 7 of the Purchase Agreement and entitled Xact to terminate payments to Koury under Section 3 of the Purchase Agreement. Koury disputes these claims.

C.    Xact ceased payments to Koury and did not make the August, 2007 and September, 2007 payments, each in the scheduled amount of $28,023.78.

D.    Xact's primary lending bank has indicated that it may take certain actions that, pursuant to a Subordination Agreement executed by Xact and Koury, may affect Xact's ability to make payment under section 4 of the Purchase Agreement, which section remains in full force and effect.

E.    Xact and Koury have now reached agreement on the following Amendment to the Purchase Agreement in order to resolve their disagreement over the effect of the Employment.

AGREEMENTS:

1.    Unless otherwise defined herein, all capitalized terms shall have the same definition as set forth in the Purchase Agreement.

2.    In consideration of Koury's promises and agreements set forth in this Amendment, Xact and the Company hereby release and discharge Koury from any and all claims, losses, liabilities, obligations or costs arising out of or relating to the Employment.

3.    In consideration for the release set forth in paragraph 2 of this Amendment, Koury agrees as follows:

(a)    Koury hereby releases and discharges Xact and the Company or any of their officers, directors, employees, affiliates or agents from any and all claims, losses, liabilities, obligations or costs arising out of or relating to the August 2007 and September 2007 payments referenced in paragraph C of the recitals above.

DB03/803937.0007/8020651.2

Oct. 03 2007 04:29PM P2        FAX NO. : 7325219733        FROM : CPA OFFICESOF SEAN F BYRNES

10/03/2007  3:27PM (GMT-05:00)

(b)     Koury hereby agrees that the Purchase Price and payment terms set forth in Section 3 of the Purchase Agreement are modified as follows:

(1)     the Purchase Price is reduced by $40,193.40, representing the principal amount of the scheduled August 2007 and September 2007 payments that have been released hereunder, plus an additional $150,000.00, for a total reduction in the Purchase Price of $190,193.40. The Purchase Price is therefore amended to be $1,159,806.60.

(2)     The remaining balance owed on the Purchase Price, taking into account payments previously made and the reduction stated in paragraph 3(b)(1) of this Amendment, is $856,437.90, which sum shall be payable on a deferred basis over a forty-three (43) month period, together with interest on the unpaid portion at the rate of 9% per annum, a schedule of which is attached hereto as Exhibit E-1, which shall replace Exhibit E to the original Purchase Agreement. Accordingly, subject to the terms of the Subordination Agreement, the Company shall pay forty-three (43) consecutive monthly installments of $23,375.09 each, with the first such payment to be made on October ___, 2007 and the last such payment to be made on April ___, 2011; provided, however, in the event there shall be an Exit Event, the unpaid portion of the Purchase Price shall be payable within five (5) days after the occurrence of such Exit Event; provided further, in the event Koury materially violates any provision of Section 7(a) of this Agreement or violates in any respect any provision of Section 7(b) or Section 7(c) of this Agreement, Koury shall be released from any further obligation under paragraphs 7(a), 7(b) or 7(c) of the Agreement and the Company shall be excused from making any further payments of the Purchase Price (and interest thereon), and its obligation to make such further payments shall be extinguished and of no further force or effect (it being understood and agreed that such extinguishment of the Company's obligation to pay the remainder of the Purchase Price shall be considered as a buy-out by Koury of his remaining obligations under Sections 7(a), 7(b) and 7(c)). For purposes hereof, an "Exit Event" shall mean (a) the sale of all or substantially all of the assets of the Company or (b) the sale of 51% or more of the Membership Interest in the Company by Xact other than a sale or transfer to an entity controlled by Xact. Xact hereby guarantees the Company's obligations under this Section 3.

(c)     Koury shall provide to Xact an affidavit setting forth the dates of the Employment, the individual or entity that was his employer for the Employment, that the Employment has terminated and that he has no further affiliation, ownership, partnership or contractual relationship with the employer or its affiliates, or with any other entity that is in competition with Xact's and/or the Company's business in the Markets served by Xact and/or the Company.

4.     Add the following introductory sentence to Section 7, before any subheadings:

"7.     For so long as Koury wishes to continue Xact's payment obligation or until May 4, 2009, whichever earlier occurs:"

5.     Delete Section 7(d) of the Purchase Agreement.

DB01/803937.0007/6822566.1
DB01/803937.0007/8029651 2

6.   Section 8 of the Purchase Agreement is hereby modified to read as follows:

"8.   Koury acknowledges and agrees that the Company has no liability or obligation to him (including any right to indemnification under law or otherwise), other than as expressly provided in this agreement. Koury hereby agrees to indemnify and hold harmless the Company, its officers, employees and members (including Xact) from any and all claims, losses, liabilities, fines, assessments, penalties, obligations and costs threatened or imposed against the Company (as well as any attorney's fees or costs of investigation associated with such claims) (each, a "Loss") related to or arising out of (a) any failure of any representation or warranty made by Koury in this agreement, (b) the employment of Mary Koury by the Company or the termination of her employment with the Company as contemplated by Section 17 hereof, or (c) any and all third party claims resulting from actions taken by Koury, or at his direction, on behalf of the Company or otherwise (whether or not taken in the scope of his employment) on or prior to the date hereof other than (i) certain actions taken with respect to one customer in the New York market, which actions have been disclosed to the Company completely, truthfully, and in no way misleading, and (ii) actions taken in good faith and in furtherance of the best interest of the Company; provided, however any actions taken by Koury or at his direction (but not including those actions referred to in the foregoing clause (i)) that would be a violation of any law that would result in criminal sanctions, fines or assessment to Koury, the Company or any person that has a business relationship with the Company shall in all respects be covered and included in Koury's obligation to indemnify hereunder; provided, however, notwithstanding the foregoing (x) Koury shall only be liable to the Company for legal fees incurred by the Company in connection with a claim by a third party if the Company has been found liable for damages, fines, assessments or penalties to such third party by a court of competent jurisdiction, and (y) Koury shall not be liable to the Company for consequential, special, punitive or exemplary damages incurred by the Company unless the same have been awarded to a third party as a result of a legal proceeding before a court of competent jurisdiction. Koury's obligations under this paragraph 8 shall be limited to the Purchase Price hereunder, $1,159,806.60. Koury shall not be required to indemnify for any Loss to the extent the Company receives insurance recoveries with respect to such Loss. The Company agrees that it will not exercise any right of setoff it may have with respect to its obligation to make payments of the Purchase Price under Section 3 above unless and until (1) in the case of Losses relating to claims, liabilities, fines, penalties, etc. by or to third parties, the Company has actually sustained a Loss pursuant to a settlement or plea bargaining agreement or pursuant to a court order, judgment or verdict, and (2) in the case of a Loss resulting from a breach of Sections 8(a) and 8(b) above, when the Loss has actually been sustained by the Company."

7.   All remaining terms and provisions of the Purchase Agreement that are not expressly amended herein shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have made and entered into this agreement the day and year first above written.

Joseph E. Koury

ACCURATE REPRO, LLC

By:   Xccllence, Inc. and Joseph E.

10/03/2007  3:27PM (GMT-05:00)

XCELLENCE, INC.

_Robert Polus_
Robert Polus
Chairman of the Board
Xcellence, Inc.

Koury, members of Accurate
Repro, LLC

By: _Robert Polus_
Robert Polus
Chairman of the Board
Xcellence, Inc.

By: _____
Joseph E. Koury

DB03/803937.0007/6822560.1
DB03/803937.0007/6029651.2

Oct. 03 2007 04:38PM P5        FAX NO. : 7325219733        FROM : LAW OFFICESOF SEAN F BARNES

**EXHIBIT 4**



 **Commerce Bank**

Lenexa Banking Center
8700 Monrovis Street
Lenexa, Kansas 66215
(816) 234-2000

September 26, 2007

CERTIFIED MAIL, RETURN RECEIPT REQUESTED

JOSEPH E. KOURY
18 Club Way
Red Bank, New Jersey 07701

        Re:  Subordination Agreement

Dear Mr. Koury:

        Reference is made to that certain Subordination Agreement
("Agreement") dated June 12, 2006, by and among Xcellence, Inc.
("Borrower"), Accurate Repro, LLC ("Subordinating Entity"),
Joseph E. Koury ("Creditor") and Commerce Bank, N.A. ("Lender").

        Terms used herein which are defined in the Agreement shall
have the meanings given to them in the Agreement.

        Pursuant to the Agreement, with respect to the Subordinated
Indebtedness, Creditor agreed as follows:

        All Subordinated Indebtedness of Subordinating Entity to
        Creditor is and shall be subordinated in all respects to all
        Superior Indebtedness of Borrower to Lender.

        Also pursuant to the Agreement, with respect to payments
received on the Subordinated Indebtedness, Creditor agreed as
follows:

        ... Subordinating Entity may make regularly scheduled
        payments of $28,023.78 each month to Creditor in accordance
        with the terms of the Subordinated Indebtedness so long as
        Borrower is not in default under any agreement between Lender
        and Borrower.  Creditor may not accelerate any amounts owed
        to Creditor without Lender's prior written consent.

        Notice is hereby given that Borrower is currently in default
under one or more agreements between Lender and Borrower.

COPY

Mr. Joseph E. Koury
September 26, 2007
Page 2


Accordingly, until further notice, Creditor shall not be entitled
or allowed to receive or collect any more payments from
Subordinating Entity with respect to the Subordinated
Indebtedness.

    Your prompt attention to this matter will be expected.
Should you have any questions, please feel free to give me a
call; my direct number is 816-234-2324.

                              Sincerely,

                              Pamela Hosty (sd)

                              Pamela Hosty
                              Vice President


cc:  Xcellence, Inc.
     5800 Foxridge, Ste 406
     Mission, Kansas 66202

**EXHIBIT B**

# SUBORDINATION AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call | Collateral | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| $3,900,000.00 | 06-14-2006 | 06-14-2007 | 9001 | 4A0 | 9093 | 2739315 | 29405 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**
XCELLENCE, INC.
5410 W 61ST PLACE
MISSION, KS 66205

**Lender:**
COMMERCE BANK, N.A.
SHAWNEE BANKING CENTER
11101 JOHNSON DRIVE
SHAWNEE, KS 66203

**Subordinating Entity:**
ACCURATE REPRO LLC
5410 W 61ST PLACE
MISSION, KS 66205

**Creditor:**
JOSEPH E. KOURY
18 CLUB WAY
RED BANK , NJ 07701

**THIS SUBORDINATION AGREEMENT dated June 12, 2006, is made and executed among Xcellence, Inc.; 5410 W 61st Place, Mission, KS 66205 ("Borrower"); Accurate Repro, LLC; 5410 W 61st Place, Mission KS 66205 ("Subordinating Entity"), Joseph E. Koury, 18 Club Way, Red Bank , NJ 07701 ("Creditor"); and Commerce Bank, N.A.; Shawnee Banking Center; 11101 Johnson Drive; Shawnee, KS 66203 ("Lender").**

**CURRENT INDEBTEDNESS OWING TO CREDITOR.** As of the date of this Agreement, Subordinating Entity is indebted to Creditor in the **aggregate amount of $1,314,068.20**. This amount is the total indebtedness of every kind from Subordinating Entity to Creditor.

**REQUESTED FINANCIAL ACCOMMODATIONS.** Creditor and Subordinating Entity each want Lender to provide financial accommodations to Borrower in the form of (A) new credit or loan advances, (B) an extension of time to pay or other compromises regarding all or part of Borrower's present indebtedness to Lender, or (C) other benefits to Borrower. Subordinating Entity and Creditor each represent and acknowledge to Lender that Creditor will benefit as a result of these financial accommodations from Lender to Borrower, and Creditor acknowledges receipt of valuable consideration for entering into this Agreement. **Based on the representations and acknowledgments contained in this Agreement, Borrower and Creditor agree with Lender as follows:**

**SUBORDINATED INDEBTEDNESS.** The words "Subordinated Indebtedness" as used in this Agreement mean the following specific indebtedness from **Subordinating Entity to Creditor**, including all renewals, extensions, modifications and substitutions for the indebtedness, including principal, interest, and all costs and attorneys' fees, relating to the indebtedness: **All indebtedness related to the Purchase Agreement dated May 3, 2006 between Creditor, Borrower, and Subordinating Entity, which has a balance of $1,314,068.20 as of the date of this Agreement.**

**SUPERIOR INDEBTEDNESS.** The words "Superior Indebtedness" as used in this Agreement mean and include all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from **Borrower to Lender.** The term "Superior Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting Lender's rights in security (such as paying for insurance on collateral if the owner fails to do so), all contingent obligations of Borrower (such as a guaranty), all obligations arising by reason of Borrower's accounts with Lender (such as an overdraft on a checking account), and all other obligations of Borrower to Lender, secured or unsecured, of any nature whatsoever.

**SUBORDINATION.** All Subordinated Indebtedness of Subordinating Entity to Creditor is and shall be subordinated in all respects to all Superior Indebtedness of Borrower to Lender. If Creditor holds one or more Security Interests, whether now existing or hereafter acquired, in any of Subordinating Entity's real property or personal property, Creditor also subordinates all Creditor's Security Interests to all Security Interests held by Lender, whether now existing or hereafter acquired.

**PAYMENTS TO CREDITOR.** Except as provided below, Subordinating Entity will not make and Creditor will not accept, at any time while any Superior Indebtedness is owing to Lender, (A) any payment upon any Subordinated Indebtedness, (B) any advance, transfer, or assignment of assets to Creditor in any form whatsoever that would reduce at any time or in any way the amount of Subordinated Indebtedness, or (C) any transfer of any assets as security for the Subordinated Indebtedness. Notwithstanding the foregoing, Subordinating Entity may make regularly scheduled payments of **$28,023.78 each month** to Creditor in accordance with the terms of the Subordinated Indebtedness so long as Borrower is not in default under any agreement between Lender and Borrower. Creditor may not accelerate any amounts owed to Creditor without Lender's prior written consent.

In the event of any distribution, division, or application, whether partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of Borrower's assets, or the proceeds of Borrower's assets, in whatever form, to creditors of Borrower or upon any indebtedness of Borrower, whether by reason of the liquidation, dissolution or other winding-up of Borrower, or by reason of any execution sale, receivership, insolvency, or

SUBORDINATION AGREEMENT

bankruptcy proceeding, assignment for the benefit of creditors, proceedings for reorganization, or readjustment of Borrower or Borrower's properties, then and in such event, (A)  the Superior Indebtedness shall be paid in full before any payment is made upon the Subordinated Indebtedness, and (B)  all payments and distributions, of any kind or character and whether in cash, property, or securities, which shall be payable or deliverable upon or in respect of the Subordinated Indebtedness shall be paid or delivered directly to Lender for application in payment of the amounts then due on the Superior Indebtedness until the Superior Indebtedness shall have been paid in full.

In order that Lender may establish its right to prove claims and recover for its own account dividends based on the Subordinated Indebtedness, Creditor does hereby assign all its right, title, and interest in such claims to Lender. Creditor further agrees to supply such information and evidence, provide access to and copies of such of Creditor's records as may pertain to the Subordinated Indebtedness, and execute such instruments as may be required by Lender to enable Lender to enforce all such claims and collect all dividends, payments, or other disbursements which may be made on account of the Subordinated Indebtedness. For such purposes, Creditor hereby irrevocably authorizes Lender in its discretion to make and present for or on behalf of Creditor such proofs of claims on account of the Subordinated Indebtedness as Lender may deem expedient and proper and to vote such claims in any such proceeding and to receive and collect any and all dividends, payments, or other disbursements made thereon in whatever form the same may be paid or issued and to apply the same on account of the Superior Indebtedness.

Should any payment, distribution, security, or proceeds thereof be received by Creditor at any time on the Subordinated Indebtedness contrary to the terms of this Agreement, Creditor immediately will deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Creditor if necessary), for application on or to secure the Superior Indebtedness, whether it is due or not due, and until so delivered the same shall be held in trust by Creditor as property of Lender. In the event Creditor fails to make any such endorsement or assignment, Lender, or any of its officers on behalf of Lender, is hereby irrevocably authorized by Creditor to make the same.

**CREDITOR'S NOTES.**  Creditor agrees to deliver to Lender, at Lender's request, all notes of Subordinating Entity to Creditor, or other evidence of the Subordinated Indebtedness, now held or hereafter acquired by Creditor, while this Agreement remains in effect.  At Lender's request, Subordinating Entity also will execute and deliver to Creditor a promissory note evidencing any book account or claim now or hereafter owed by Subordinating Entity to Creditor, which note also shall be delivered by Creditor to Lender.  Creditor agrees not to sell, assign, pledge or otherwise transfer any of such notes except subject to all the terms and conditions of this Agreement.

**CREDITOR'S REPRESENTATIONS AND WARRANTIES.**  Creditor represents and warrants to Lender that: (A) no representations or agreements of any kind have been made to Creditor which would limit or qualify in any way the terms of this Agreement; (B)  this Agreement is executed at Borrower's request and not at the request of Lender; (C)  Lender has made no representation to Creditor as to the creditworthiness of Subordinating Entity; and (D)  Creditor has established adequate means of obtaining from Subordinating Entity on a continuing basis information regarding Subordinating Entity's financial condition. Creditor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Creditor's risks under this Agreement, and Creditor further agrees that Lender shall have no obligation to disclose to Creditor information or material acquired by Lender in the course of its relationship with Subordinating Entity.

**CREDITOR'S WAIVERS.**  Creditor waives any right to require Lender: (A) to make, extend, renew, or modify any loan to Subordinating Entity or to grant any other financial accommodations to Subordinating Entity whatsoever; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Superior Indebtedness or of any nonpayment related to any Security Interests, or notice of any action or nonaction on the part of Subordinating Entity, Lender, any surety, endorser, or other guarantor in connection with the Superior Indebtedness, or in connection with the creation of new or additional Superior Indebtedness; (C)  to resort for payment or to proceed directly or at once against any person, including Subordinating Entity; (D)  to proceed directly against or exhaust any Security Interests held by Lender from Subordinating Entity, any other guarantor, or any other person; (E)  to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Subordinating Entity or to comply with any other applicable provisions of the Uniform Commercial Code; (F)  to pursue any other remedy within Lender's power; or  (G)  to commit any act or omission of any kind, at any time, with respect to any matter whatsoever.

**LENDER'S RIGHTS.**  Lender may take or omit any and all actions with respect to the Superior Indebtedness or any Security Interests for the Superior Indebtedness without affecting whatsoever any of Lender's rights under this Agreement.  In particular, without limitation, Lender may, without notice of any kind to Creditor, (A)  make one or more additional secured or unsecured loans to Borrower; (B)  repeatedly alter, compromise, renew, extend, accelerate, or otherwise change the time for payment or other terms of the Superior Indebtedness or any part thereof, including increases and decreases of the rate of interest on the Superior Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C)  take and hold Security Interests for the payment of the Superior Indebtedness, and exchange, enforce, waive, and release any such Security Interests, with or without the substitution of new collateral; (D)  release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or guarantors on any terms or manner Lender chooses; (E)  determine how, when and what application of payments and credits, shall be made on the Superior Indebtedness; (F)  apply such security and direct the order or manner of sale thereof, as Lender in its discretion may determine; and  (G)  assign this Agreement in whole or in part.

**DEFAULT BY BORROWER.**  If Borrower becomes insolvent or bankrupt, this Agreement shall remain in full force and effect.  Any default by Subordinating Entity under the terms of the Subordinated Indebtedness also shall constitute an event of default under the terms of the Superior Indebtedness in favor of Lender.

**DURATION AND TERMINATION.** This Agreement will take effect when received by Lender, without the necessity of any acceptance by Lender, in writing or otherwise, and will remain in full force and effect until Creditor shall notify Lender in writing at the address shown above to the contrary. Any such notice shall not affect the Superior Indebtedness owed Lender by Borrower at the time of such notice, nor shall such notice affect Superior Indebtedness thereafter granted in compliance with a commitment made by Lender to Borrower prior to receipt of such notice, nor shall such notice affect any renewals of or substitutions for any of the foregoing. Such notice shall affect only indebtedness of Borrower to Lender arising after receipt of such notice and not arising from financial assistance granted by Lender to Borrower in compliance with Lender's obligations under a commitment. Any notes lodged with Lender pursuant to the section titled "Creditor's Notes" above need not be returned until this Agreement has no further force or effect.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Lender may hire or pay someone else to help enforce this Agreement, and Creditor shall pay the costs and expenses of such enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Indebtedness, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

**Authority.** The person who signs this Agreement as or on behalf of Creditor represents and warrants that he or she has authority to execute this Agreement and to subordinate the Subordinated Indebtedness and the Creditor's security interests in Creditor's property, if any.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Kansas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Kansas.**

**Interpretation.** In all cases where there is more than one Creditor, then all words used in this Agreement in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Creditor named in this Agreement or when this Agreement is executed by more than one , the words "Creditor" shall mean all and any one or more of them. Reference to the phrase "Creditor" includes the heirs, successors, assigns, and transferees of each of them.

**Successors and Assigns.** This Agreement shall be understood to be for the benefit of Lender and for such other person or persons as may from time to time become or be the holder or owner of any of the Indebtedness or any interest therein, and this Agreement shall be transferable to the same extent and with the same force and effect as any such Indebtedness may be transferable.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Creditor, shall constitute a waiver of any of Lender's rights or of any of Creditor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Waive Jury. All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Subordination Agreement, as this Subordination Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Subordination Agreement from time to time.

**Borrower.** The word "Borrower" means Xcellence, Inc. and includes all co-signers and co-makers signing the Note.

**Creditor.** The word "Creditor" means Joseph E. Koury.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Commerce Bank, N.A., its successors and assigns.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Loan No. 9001

**SUBORDINATION AGREEMENT**
(Continued)

Page 4

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Subordinating Entity.** The words "Subordinating Entity" mean Accurate Repro, LLC .

**Subordinated Indebtedness.** The words "Subordinated Indebtedness" mean the indebtedness described in the section of this Agreement titled "Subordinated Indebtedness".

**Superior Indebtedness.** The words "Superior Indebtedness" mean the indebtedness described in the section of this Agreement titled "Superior Indebtedness".

BORROWER AND CREDITOR EACH ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS SUBORDINATION AGREEMENT, AND BORROWER AND CREDITOR EACH AGREE TO ITS TERMS. THIS AGREEMENT IS DATED JUNE 12, 2006.

BORROWER:

Xcellence, Inc.

By: _____

Name: _Bob Polus_

Title: _President_

SUBORDINATING ENTITY:

Accurate Repro, LLC

By: _____

Name: _Bob Polus_

Title: _President_

CREDITOR:

X _____
  Joseph E. Koury, Individually

LASER PRO Lending, Ver. 5.26.00.005 Copr. Harland Financial Solutions, Inc. 1997, 2006. All Rights Reserved. - KS c:\plfl\CF8LPLIF10.FC TR-104017 PR-3 (M)

**EXHIBIT C**

*00044948277-10000-110012102007*

# SUBORDINATION AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $4,000,000.00 | 12-10-2007 | 12-09-2008 | 44948277-10000- | M120 / G0 | 00006398447 | 50209 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item

Any item above containing "****" has been omitted due to text length limitations

**Borrower:** Xcellence, Inc.
5800 Foxridge Dr Suite 406
Mission, KS 66202

**Lender:** M&I Marshall & Ilsley Bank
Plaza - Central States Commercial Lending
800 West 47th Street
Kansas City, MO 64112

**Creditor:** Joe Koury
18 Club Way
Red Bank, NJ 07701

THIS SUBORDINATION AGREEMENT dated December 10, 2007, is made and executed among Xcellence, Inc.; 5800 Foxridge Dr Suite 406; Mission, KS 66202 ("Borrower"); Joe Koury, 18 Club Way, Red Bank, NJ 07701 ("Creditor"); and M&I Marshall & Ilsley Bank, Plaza - Central States Commercial Lending , 800 West 47th Street, Kansas City, MO 64112 ("Lender").

CURRENT INDEBTEDNESS OWING TO CREDITOR. As of the date of this Agreement, Borrower is indebted to Creditor in the aggregate amount of $856,437.90  This amount is the total indebtedness of every kind from Borrower to Creditor

REQUESTED FINANCIAL ACCOMMODATIONS. Creditor and Borrower each want Lender to provide financial accommodations to Borrower in the form of (A) new credit or loan advances, (B) an extension of time to pay or other compromises regarding all or part of Borrower's present indebtedness to Lender, or (C) other benefits to Borrower. Borrower and Creditor each represent and acknowledge to Lender that Creditor will benefit as a result of these financial accommodations from Lender to Borrower, and Creditor acknowledges receipt of valuable consideration for entering into this Agreement. Based on the representations and acknowledgments contained in this Agreement, Borrower and Creditor agree with Lender as follows:

SUBORDINATED INDEBTEDNESS. The words "Subordinated Indebtedness" as used in this Agreement mean all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from Borrower to Creditor. The term "Subordinated Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting the rights of a holder of security, all contingent obligations of Borrower (such as a guaranty), and all other obligations, secured or unsecured, of any nature whatsoever

SUPERIOR INDEBTEDNESS. The words "Superior Indebtedness" as used in this Agreement mean and include all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from Borrower to Lender  The term "Superior Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting Lender's rights in security (such as paying for insurance on collateral if the owner fails to do so), all contingent obligations of Borrower (such as a guaranty), all obligations arising by reason of Borrower's accounts with Lender (such as an overdraft on a checking account), and all other obligations of Borrower to Lender, secured or unsecured, of any nature whatsoever

SUBORDINATION. All Subordinated Indebtedness of Borrower to Creditor is and shall be subordinated in all respects to all Superior Indebtedness of Borrower to Lender. If Creditor holds one or more Security Interests, whether now existing or hereafter acquired, in any of Borrower's real property or personal property, Creditor also subordinates all Creditor's Security Interests to all Security Interests held by Lender, whether now existing or hereafter acquired

PAYMENTS TO CREDITOR. Except as provided below, Borrower will not make and Creditor will not accept, at any time while any Superior Indebtedness is owing to Lender, (A)  any payment upon any Subordinated Indebtedness, (B)  any advance, transfer, or assignment of assets to Creditor in any form whatsoever that would reduce at any time or in any way the amount of Subordinated Indebtedness, or (C)  any transfer of any assets as security for the Subordinated Indebtedness. Notwithstanding the foregoing, Borrower may make regularly scheduled payments of $23,375.09 each Month to Creditor in accordance with the terms of the Subordinated Indebtedness so long as Borrower is not in default under any agreement between Lender and Borrower Creditor may not accelerate any amounts owed to Creditor without Lender's prior written consent.

In the event of any distribution, division, or application, whether partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of Borrower's assets, or the proceeds of Borrower's assets, in whatever form, to creditors of Borrower or upon any indebtedness of Borrower, whether by reason of the liquidation, dissolution or other winding-up of Borrower, or by reason of any execution sale, receivership, insolvency, or bankruptcy proceeding, assignment for the benefit of creditors, proceedings for reorganization, or readjustment of Borrower or Borrower's properties, then and in such event, (A)  the Superior Indebtedness shall be paid in full before any payment is made upon the Subordinated Indebtedness, and (B)  all payments and distributions, of any kind or character and whether in cash, property, or securities, which shall be payable or deliverable upon or in respect of the Subordinated Indebtedness shall be paid or delivered directly to Lender for application in payment of the amounts then due on the Superior Indebtedness until the Superior Indebtedness shall have been paid in full.

In order that Lender may establish its right to prove claims and recover for its own account dividends based on the Subordinated Indebtedness, Creditor does hereby assign all its right, title, and interest in such claims to Lender. Creditor further agrees to supply such information and evidence, provide access to and copies of such of Creditor's records as may pertain to the Subordinated Indebtedness, and execute such instruments as may be required by Lender to enable Lender to enforce all such claims and collect all dividends, payments, or other disbursements which may be made on account of the Subordinated Indebtedness. For such purposes, Creditor hereby irrevocably authorizes Lender in its discretion to make and present for or on behalf of Creditor such

proofs of claims on account of the Subordinated Indebtedness as Lender may deem expedient and proper and to vote such claims in any such proceeding and to receive and collect any and all dividends, payments, or other disbursements made thereon in whatever form the same may be paid or issued and to apply the same on account of the Superior Indebtedness.

Should any payment, distribution, security, or proceeds thereof be received by Creditor at any time on the Subordinated Indebtedness contrary to the terms of this Agreement, Creditor immediately will deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Creditor if necessary), for application on or to secure the Superior Indebtedness, whether it is due or not due, and until so delivered the same shall be held in trust by Creditor as property of Lender  In the event Creditor fails to make any such endorsement or assignment, Lender, or any of its officers on behalf of Lender, is hereby irrevocably authorized by Creditor to make the same

CREDITOR'S NOTES.  Creditor agrees to deliver to Lender, at Lender's request, all notes of Borrower to Creditor, or other evidence of the Subordinated Indebtedness, now held or hereafter acquired by Creditor, while this Agreement remains in effect.  At Lender's request, Borrower also will execute and deliver to Creditor a promissory note evidencing any book account or claim now or hereafter owed by Borrower to Creditor, which note also shall be delivered by Creditor to Lender.  Creditor agrees not to sell, assign, pledge or otherwise transfer any of such notes except subject to all the terms and conditions of this Agreement.

CREDITOR'S REPRESENTATIONS AND WARRANTIES.  Creditor represents and warrants to Lender that:  (A)  no representations or agreements of any kind have been made to Creditor which would limit or qualify in any way the terms of this Agreement;  (B)  this Agreement is executed at Borrower's request and not at the request of Lender; and (C)  Lender has made no representation to Creditor as to the creditworthiness of Borrower, and Creditor further agrees that Lender shall have no obligation to disclose to Creditor information or material acquired by Lender in the course of its relationship with Borrower

CREDITOR'S WAIVERS.  Creditor waives any right to require Lender:  (A)  to make, extend, renew, or modify any loan to Borrower or to grant any other financial accommodations to Borrower whatsoever;  (B)  to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Superior Indebtedness or of any nonpayment related to any Security Interests, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Superior Indebtedness, or in connection with the creation of new or additional Superior Indebtedness;  (C)  to resort for payment or to proceed directly or at once against any person, including Borrower;  (D)  to proceed directly against or exhaust any Security Interests held by Lender from Borrower, any other guarantor, or any other person;  (E)  to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code;  (F)  to pursue any other remedy within Lender's power; or  (G)  to commit any act or omission of any kind, at any time, with respect to any matter whatsoever.

LENDER'S RIGHTS.  Lender may take or omit any and all actions with respect to the Superior Indebtedness or any Security Interests for the Superior Indebtedness without affecting whatsoever any of Lender's rights under this Agreement  In particular, without limitation, Lender may, without notice of any kind to Creditor, (A)  make one or more additional secured or unsecured loans to Borrower;  (B)  repeatedly alter, compromise, renew, extend, accelerate, or otherwise change the time for payment or other terms of the Superior Indebtedness or any part thereof, including increases and decreases of the rate of interest on the Superior Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C)  take and hold Security Interests for the payment of the Superior Indebtedness, and exchange, enforce, waive, and release any such Security Interests, with or without the substitution of new collateral;  (D)  release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or guarantors on any terms or manner Lender chooses;  (E)  determine how, when and what application of payments and credits, shall be made on the Superior Indebtedness;  (F)  apply such security and direct the order or manner of sale thereof, as Lender in its discretion may determine; and (G)  assign this Agreement in whole or in part

DEFAULT BY BORROWER.  If Borrower becomes insolvent or bankrupt, this Agreement shall remain in full force and effect.  Any default by Borrower under the terms of the Subordinated Indebtedness also shall constitute an event of default under the terms of the Superior Indebtedness in favor of Lender

DURATION AND TERMINATION.  This Agreement will take effect when received by Lender, without the necessity of any acceptance by Lender, in writing or otherwise, and will remain in full force and effect until Creditor shall notify Lender in writing at the address shown above to the contrary  Any such notice shall not affect the Superior Indebtedness owed Lender by Borrower at the time of such notice, nor shall such notice affect Superior Indebtedness thereafter granted in compliance with a commitment made by Lender to Borrower prior to receipt of such notice, nor shall such notice affect any renewals of or substitutions for any of the foregoing.  Such notice shall affect only indebtedness of Borrower to Lender arising after receipt of such notice and not arising from financial assistance granted by Lender to Borrower in compliance with Lender's obligations under a commitment  Any notes lodged with Lender pursuant to the section titled "Creditor's Notes" above need not be returned until this Agreement has no further force or effect

HEDGING INSTRUMENTS.  Obligations and indebtedness includes, without limitation all obligations, indebtedness and liabilities arising pursuant to or in connection with any interest rate swap transaction, basis swap, forward rate transaction, interest rate option, price risk hedging transaction or any similar transaction between the Borrower and Lender

MISCELLANEOUS PROVISIONS.  The following miscellaneous provisions are a part of this Agreement:

Amendments.  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment

Attorneys' Fees; Expenses.  Creditor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Creditor shall pay the costs and expenses of such enforcement  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals  Creditor also shall pay all court costs and such additional fees as may be directed by the court

Authority.  The person who signs this Agreement as or on behalf of Creditor represents and warrants that he or she has authority to execute this Agreement and to subordinate the Subordinated Indebtedness and the Creditor's security interests in Creditor's property, if any

Caption Headings.  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement

Governing Law.  This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions.  This Agreement has been accepted by Lender in the State of Missouri.

**Choice of Venue.** If there is a lawsuit, Creditor agrees upon Lender's request to submit to the jurisdiction of the courts of Jackson County, State of Missouri.

**Interpretation.** In all cases where there is more than one Creditor, then all words used in this Agreement in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Creditor named in this Agreement or when this Agreement is executed by more than one , the words "Creditor" shall mean all and any one or more of them. Reference to the phrase "Creditor" includes the heirs, successors, assigns, and transferees of each of them. All of the obligations of Creditor under this Agreement (if more than one) shall be joint and several.

**Successors and Assigns.** This Agreement shall be understood to be for the benefit of Lender and for such other person or persons as may from time to time become or be the holder or owner of any of the Indebtedness or any interest therein, and this Agreement shall be transferable to the same extent and with the same force and effect as any such Indebtedness may be transferable.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Creditor, shall constitute a waiver of any of Lender's rights or of any of Creditor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Subordination Agreement, as this Subordination Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Subordination Agreement from time to time.

**Borrower.** The word "Borrower" means Xcellence, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Creditor.** The word "Creditor" means Joe Koury.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means M&I Marshall & Ilsley Bank, its successors and assigns.

**Note.** The word "Note" means the Note executed by Xcellence, Inc in the principal amount of $4,000,000.00 dated December 10, 2007, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Subordinated Indebtedness.** The words "Subordinated Indebtedness" mean the indebtedness described in the section of this Agreement titled "Subordinated Indebtedness."

**Superior Indebtedness.** The words "Superior Indebtedness" mean the indebtedness described in the section of this Agreement titled "Superior Indebtedness."

**WAIVE JURY.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**BORROWER AND CREDITOR EACH ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS SUBORDINATION AGREEMENT, AND BORROWER AND CREDITOR EACH AGREE TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 10, 2007.**

BORROWER:

XCELLENCE, INC.
By:
Robert Polus, President & CEO of Xcellence, Inc.

CREDITOR:

X
Joe Koury, Individually

BORROWER:

XCELLENCE, INC.
By:
Robert Polus, President & CEO of Xcellence, Inc.

CREDITOR:
X
Joe Kours, Individually

Dec 18 2007 09:18am  P002/002
Fax:917-342-8505
AdminStaff
Dec. 18 2007 05:49PM  P2
FAX NO. :7325219733
FROM :LAW OFFICEOF SEAN F BARNES