**UNITED STATES DISTRICT COURT**
**SOUTHERN  DISTRICT OF NEW YORK**
------------------------------------------------------ X
                                     :

**JOSEPH KOURY,**                            :

                       **Plaintiff,**        :

                                       :

          **- against -**             :

                                       :

**XCELLENCE, INC., d/b/a/ XACT,**   :
**ROBERT POLUS, and BARBARA**    :
**AMOS,**    :
                  **Defendants.**     :

------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/13/09

**OPINION AND ORDER**

**08 Civ. 5409 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Joesph Koury brings this action against Xcellence, Inc., d/b/a Xact ("Xact") and two of its officers for events arising out of the sale of Koury's reproduction services business to Xact in May 2006.  Specifically, Koury asserts that Xact breached the sale contract and that all defendants breached their fiduciary duties.  Defendants now move to dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.   For the reasons discussed below, defendants' motion is granted in part and denied in part.

## II.   BACKGROUND

### A.   Facts

1

On May 3, 2006, Koury sold his membership interest in Accurate Repro, LLC to Xact for $1,350,000.[1]  Koury resides in New Jersey.[2]   Xact is a Missouri corporation with its principal place of business in Kansas.[3]  Accurate Repro's principal place of business was in New York City.[4]  According to the Purchase Agreement executed by Koury and Xact, the purchase price was to be paid to Koury in monthly installments of $28,023.78, with the first payment to be made on May 3, 2006 and the last payment to be made on April 3, 2011.[5]  Under the Purchase Agreement, Koury agreed not to compete with Xact for three years in markets served by Xact or Accurate Repro.[6]  Koury further agreed that his rights to monthly payments were subordinate to the rights of "all holders of indebtedness of borrowed money of [Accurate Repro] and/or of Xact" and that he "agree[d] to enter into any further subordination agreement that may be required by any lender

---

[1]    *See* Amended Complaint ("Am. Compl.") ¶¶ 16, 18.

[2]    *See id.* ¶ 6.

[3]    *See id.* ¶ 7.

[4]    *See id.* ¶ 15 ("With the exception of one small office in Florida, all of Accurate Repro, LLC's activities were out of the New York, New York office.").

[5]    *See id.* ¶ 19.

[6]    *See id.* ¶ 22.

2

of [Accurate Repro] and/or Xact."[7]

In June 2006, Koury executed a Subordination Agreement with one

of Xact's lenders, Commerce Bank ("Commerce Bank Subordination

Agreement"), pursuant to which Koury agreed to allow Commerce Bank to

subordinate his monthly payments from Xact in the event that Xact defaulted on

its loan from Commerce Bank.[8]  The Subordination Agreement contained the

following provision:

> [Xact] will not make and [Koury] will not accept, at any
> time while any Superior Indebtedness is owing to
> [Commerce Bank] . . . any payment upon any subordinated
> indebtedness . . . [except] regularly scheduled payments of
> $28,023.78 each month to [Koury] . . . so long as [Xact] is
> not in default under any agreement between Lender and
> [Xact].  [Koury] may not accelerate any amounts owed to
> [him] without [Commerce Bank's] prior written consent.[9]

"Superior Indebtedness" was defined to mean "all present and future

indebtedness . . . now or hereafter owing from Borrower or Lender."[10]  In a shaded

area at the top of the Subordination Agreement, marked "for Lender's use only,"

---

[7]     *Id.* ¶ 20.

[8]     *See id.* ¶ 21.

[9]     Commerce Bank Subordination Agreement ("Com. Bank Sub. Ag."),
Ex. B to Affirmation of Michael A. Kalish ("Defendants' counsel") in Support of
Motion to Dismiss ("Kalish Aff."), at 1.

[10]     *Id.*

3

the document stated that the loan was to begin on June 14, 2006 and would reach maturity on June 14, 2007.  The Subordination Agreement provided that it was "executed at [Xact's] request and not at the request of the lender [Commerce Bank]."[11]  The Subordination Agreement also provided that "[Koury] ha[d] established adequate means of obtaining from [Xact] on a continuing basis information regarding [Xact's] financial condition."[12]

On September 29, 2007, after Xact withheld two monthly payments in response to Koury's alleged breach of the non-compete agreement, the parties entered into an Amended Purchase Agreement, pursuant to which: (1) Koury agreed to reduce the Purchase Price by $190,193.40; (2) Koury waived his right to assert claims relating to the missed monthly payments; and (3) Xact waived its right to claim that Koury breached the non-compete agreement.[13]  The Amended Purchase Agreement also informed Koury that Commerce Bank had indicated that it "may take certain actions" to subordinate Koury's payments, pursuant to the Commerce Bank Subordination Agreement.[14]  On the date Koury signed the

---

[11]     *Id.* at 2.

[12]     Com. Bank Sub. Ag. at 2.

[13]     *See id.*

[14]     *Id.*

4

Amended Purchase Agreement, however, Xact's counsel advised Koury that Xact was not aware, as of that date, of any decision by Commerce Bank to subordinate Koury's payments.[15]

On October 3, 2007 — a few days after executing the Amended Purchase Agreement — Koury received notice from Commerce Bank in a letter dated *before* the Amended Purchase Agreement was signed that Xact was in default on its loan agreement with Commerce Bank and, therefore, Commerce Bank was subordinating Koury's monthly payments from Xact.[16] As a result, Koury received no payments from Xact for the next several months.[17]

In December 2007, Xact informed Koury that he would not receive any further payments from Xact unless and until he signed a new subordination agreement with Marshall & Ilsley Bank ("M & I Bank"), through which Xact sought to refinance its loan with Commerce Bank.[18] The first draft of the M & I Bank Subordination Agreement contained a clause, like the clause in the

---

[15]     *See* Am. Compl. ¶ 35.

[16]     *See id.* The letter was dated September 26, 2007; the Amended Purchase Agreement was signed on September 29, 2007; Koury received the letter on October 3, 2007. *See* 9/26/07 Letter from Commerce Bank from Koury, Ex. 4 to Kalish Aff.

[17]     *See* Am. Compl. ¶ 36.

[18]     *See id.* ¶ 37.

5

Commerce Bank Subordination Agreement, providing that Koury would have continual access to Xact's financial records.[19]  Prior to signing the new subordination agreement, Koury requested permission to review Xact's financial condition.[20]  Xact refused and drafted a new subordination agreement that removed the clause guaranteeing Koury's access to Xact's financial records.[21]

In order to resume his receipt of monthly payments, Koury signed the redrafted M & I Bank Subordination Agreement in late December 2007, which was made retroactive to December 10, 2007.[22]  Xact then resumed payments to Koury, making one payment in December 2007 and one payment in January 2008.[23]

On January 24, 2008, Xact defaulted on its loan agreement with M & I Bank.  M & I Bank then exercised its right to subordinate Koury's payments that

---

[19]     *See id.* ¶ 40.

[20]     *See id.*

[21]     *See id.*

[22]     *See id.* ¶ 41.  Except for the differences discussed above, the M & I Subordination Agreement contained materially identical terms to the Commerce Bank Subordination Agreement, adjusted for the amounts then due to Koury.  *See* M & I Bank Subordination Agreement ("M & I Sub. Ag."), Ex. C to Kalish Aff.

[23]     *See* Am. Compl. ¶ 41.

same day.[24]  Xact has remained in default to this day and has not made a single

payment to Koury since that time.[25]  In a letter to the Court, Xact indicated that its

Superior Indebtedness to M & I Bank is scheduled to last through at least 2012,

with the result that Koury may not receive any payments until that time.[26]

### B.     The Claims

In May 2008, Koury filed suit against Xact in New York state court.[27]

Xact removed the case to federal court based on diversity of citizenship.[28]  In his

complaint, Koury makes three claims. *First,* Koury asserts that Xact breached the

original and amended Purchase Agreements by Xact's "continued failure to pay

[Koury] the proceeds of the business [Koury] sold Defendants, including those

payments missed during the first subordination period."[29]  Specifically, Koury

claims that Xact's refusal to disclose its financial records to Koury prior to the M

& I Subordination Agreement coupled with Xact's default on the M & I loan less

---

[24]     *See id.* ¶ 43.

[25]     *See id.* ¶ 48.

[26]     *See* 12/18/08 Letter from Xact to the Court.

[27]     *See* Notice of Removal at 1.

[28]     *See* 28 U.S.C. § 1332(a).

[29]     Am. Compl. ¶ 57.

7

than six weeks after it was issued indicates that Xact foresaw the likelihood of its default on the M & I Bank loan.[30] Further, based partly on these suspicious circumstances, Koury alleges on information and belief that Xact manipulated its financial reporting to M & I Bank either to fraudulently obtain the loan in the first instance or to feign default on the loan in order to induce the subordination of Koury's monthly payments.[31] Koury requests discovery "to evaluate Xact's financial position with M & I Bank and determine whether the subordination, in fact, is justified."[32] Koury also alleges that Xact knew, but denied and failed to disclose, that Commerce Bank had determined to subordinate Koury's payments *prior* to the time when Koury signed the amended Purchase Agreement with Xact.[33] Finally, Koury argues that Xact fraudulently induced Koury to sign the Amended Purchase Agreement by falsely representing that Commerce Bank had not yet decided to subordinate Koury's payments.

*Second*, Koury seeks a declaration that because Xact has made no payments to Koury for a year, Koury is no longer restrained from competing with

---

[30] *See id.*

[31] *See id.*

[32] Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Mem.") at 9.

[33] *See* Am. Compl. ¶ 35.

8

Xact or Accurate Repro under the Amended Purchase Agreement.[34] *Third*, Koury claims that Xact and two of its officers, Robert Polus and Barbara Amos,[35] breached their fiduciary duties.[36] He claims that "Xact was apparently insolvent beginning at least December 2007."[37] This insolvency, Koury asserts, triggered certain fiduciary duties to him as one of Xact's creditors — namely, a duty "to take whatever steps are necessary to pay him by liquidating its assets or selling its business."[38]

## III.   APPLICABLE LAW

### A.   Motion to Dismiss Standard

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court

---

[34]   *See id.* ¶ 60.

[35]   Polus is the Chairman and Chief Executive Officer of Xact, *see id.* ¶ 8, and according to Koury he visited New York "on numerous occasions in connection with the transaction at issue." *Id.* ¶ 12. Amos is an officer of Xact who Koury asserts visited New York "as part of the due diligence process in connection with the transaction at issue." *Id.* ¶ 13. While Koury's amended complaint includes Polus and Amos in the breach of contract and declaratory judgment claims, *see id.* ¶¶ 57, 60, Koury now withdraws those claims against Polus and Amos. *See* Pl. Mem. at 6 n.2.

[36]   *See* Am. Compl. ¶ 63.

[37]   *Id.* ¶ 45.

[38]   *Id.* ¶ 46.

9

"'must accept as true all of the factual allegations contained in the complaint'"[39] and "draw all reasonable inferences in the plaintiff's favor."[40]  In light of the Supreme Court's decision in *Twombly*, a complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'" in order to survive a motion to dismiss.[41]  In short, a pleader must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."[42]

In deciding a motion to dismiss, the court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by

---

[39]     *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1975 (2007) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n.1 (2002)).

[40]     *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006) (citation omitted).

[41]     *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1965). *Accord Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (per curiam) (noting that plaintiffs must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'") (quoting *Twombly*, 127 S. Ct. at 1964); *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atlantic Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) ("[B]ald assertions and conclusions of law will not suffice.") (citation omitted).

[42]     *Iqbal v. Hasty*, 490 F.3d 143, 158 (2d Cir. 2007).

10

reference . . . and documents possessed by or known to the plaintiff and upon
which it relied in bringing the suit."[43]

"One of the most important objectives of the federal rules is that
lawsuits should be determined on their merits and according to the dictates of
justice, rather than in terms of whether or not the averments in the paper pleadings
have been artfully drawn."[44] "'So long as [the plaintiff has] alleged facts sufficient
to support a meritorious legal claim,'" a 12(b)(6) motion to dismiss may not be
granted simply "because [the plaintiff] proceeded under the wrong theory."[45]
Rather, on a motion to dismiss, "'[f]actual allegations alone are what matter[ ].'"[46]
The Court, moreover, is required to read the factual allegations in a complaint "as
a whole."[47]

## B. Breach of Contract

[43]   *ATSI Commc'ns*, 493 F.3d at 98.

[44]   5 Charles A. Wright & Arthur R. Miller, Federal Practice and
Procedure § 1286 (3d ed. 2004).

[45]   *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 89 (2d
Cir. 2000) (quoting *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d
Cir. 1997)).

[46]   *Northrop*, 134 F.3d at 46 (quoting *Albert v. Carovano*, 851 F.2d 561,
571 n. 3 (2d Cir. 1988) (en banc)).

[47]   *Shapiro v. Cantor*, 123 F.3d 717, 719 (2d Cir. 1997).

11

Under New York law, a claim for breach of contract requires (1) the

existence of a contract; (2) adequate performance of the contract by the plaintiff;

(3) breach of the contract by the defendant; and (4) damage to the plaintiff as a

result of the defendant's breach.[48]  Subordination agreements are generally upheld

under New York law.[49]

Whether a contract clause is ambiguous is a question of law.[50]

"Ambiguity exists when a material contract term or clause is susceptible of 'more

than one meaning when viewed objectively by a reasonably intelligent person who

has examined the context of the entire integrated agreement and who is cognizant

of the customs, practices, usages and terminology as generally understood in the

particular trade or business.'"[51]  Where there is no ambiguity and "'the intent of

the parties can be determined from the face of the agreement, interpretation is a

matter of law,' and a claim turning on that interpretation may be resolved on a

---

[48]    *See Grand Heritage Mgmt., LLC v. Murphy*, No. 06 Civ. 5977, 2007
WL 3355380, at \*4 (S.D.N.Y. Nov. 7, 2007) (citing *Harsco Corp. v. Segui*, 91
F.3d 337, 348 (2d Cir. 1996)).

[49]    *See AM Cosmetics, Inc. v. Solomon*, 67 F. Supp. 2d 312, 323
(S.D.N.Y. 1999) (citation omitted).

[50]    *See Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002).

[51]    *Grand Heritage Mgmt.*, 2007 WL 3355380, at \*4 (quoting *World
Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir.
2003)).

12

motion to dismiss."[52]

### 1.    Fraud in the Inducement

Under New York law, in order to assert a claim for fraud in the

inducement of a contract, a plaintiff must establish "(1) that the defendant made

material representations that were false, (2) that the defendant knew the

representations were false and made them with the intent to deceive the plaintiff,

(3) that the plaintiff justifiably relied on the defendant's representations, and (4)

that the plaintiff was injured as a result of the defendant's representations."[53]  The

party to whom the false statement has been made may not rely thereon if the truth

of that statement can be verified through the exercise of ordinary intelligence or

reasonable diligence.[54]

### 2.    Anticipatory Breach

If a "party repudiates contractual duties prior to the time designated

for performance and before all of the consideration has been fulfilled, the

---

[52]    *Id.* (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996)).

[53]    *Leno v. DePasquale*, 794 N.Y.S.2d 662, 662 (2d Dep't 2005).

[54]    *See Huron Street Realty Corp. v. Lorenzo*, 798 N.Y.S.2d 438 (2d Dep't 2005).

repudiation entitles the nonrepudiating party to claim damages for total breach."[55]
To constitute an anticipatory breach based on a request for a modification of
terms, the request must be coupled with an absolute refusal to perform unless the
request is granted.[56]  Although the non-breaching party learning of an alleged
anticipatory breach must elect either to treat the contract as terminated or continue
to treat the contract as valid (but not both), there is no set time to make this
election; rather, how much time is reasonable depends upon the facts and
circumstances of each case, in particular "the nature of the performance to be
rendered under the contract."[57]

### 3.    Implied Good Faith Terms

"Under New York law, a covenant of good faith and fair dealing is
implied in all contracts."[58]  "This covenant embraces a pledge that neither party
shall do anything which will have the effect of destroying or injuring the right of

---

[55]    *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*
92 N.Y.2d 458, 462-63 (1998).

[56]    *See O'Connor v. Sleasman*, 788 N.Y.S.2d 518, 520 (3d Dep't 2005).

[57]    *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1012-13 (S.D.N.Y.
1995).

[58]    *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374
F.3d 158, 169 (2d Cir. 2004) (citations omitted); *see* N.Y.U.C.C.  §§ 1-201(19),
1-203 (defining "good faith" as "honesty in fact in the conduct or transaction
concerned").

14

the other party to receive the fruits of the contract."[59]  "The action presumed

contrary to the parties' intention must directly violate an obligation that falls

within their reasonable expectations, that is to say, the implied promise must be so

much a part of a contract as to be essential to effectuate the contract's purposes."[60]

## C.     Breach of Fiduciary Duty

### 1.     Choice of Law

Pursuant to the Purchase Agreement, New York law governs Koury's

breach of contract claims.[61]  The Purchase Agreement is silent, however, as to the

governing law on the fiduciary duty claim.  A choice of law analysis is thus

required for the fiduciary duty claim.

In a diversity action, New York choice of law rules govern.[62]  In New

York, claims for breach of fiduciary duty are analyzed "under choice of law

---

[59]     *Id.*

[60]     *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991).

[61]     *See* Purchase Agreement, Ex. A to Am. Compl., at ¶ 11.

[62]     *See Cantor-Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir.
2002) ("To determine which state's law applies, a federal court sitting in diversity
must apply the conflict-of-laws rules of the state in which the federal court sits.")
(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

principles applicable to torts."[63]  In New York, "the first step is to determine

whether there is a substantive conflict between the laws of the relevant choices.  In

the absence of substantive difference . . . a New York court will dispense with

choice of law analysis; and if New York law is among the relevant choices, New

York courts are free to apply it."[64]

New York choice of law rules recognize the so-called internal affairs

doctrine, which asserts that "the state of incorporation has an interest superior to

that of other states in regulating the directors' conduct of the internal affairs of its

own corporations."[65]  Yet the New York Court of Appeals has rejected "'any

*automatic* application'" of the internal affairs doctrine.[66]  Rather, New York uses

an "'interest analysis' generally applying the law of the jurisdiction with the

---

[63]     *Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, No. 07 Civ. 2480,
2008 WL 4104035, at *6 n.1 (S.D.N.Y. Aug. 28, 2008).

[64]     *Pension Comm. of the Univ. of Montreal Pension Plan v. Bank of Am.
Sec., LLC*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006) (internal quotation and
citations omitted).

[65]     *BSS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129
(S.D.N.Y. 1999).

[66]     *Stephens v. National Distillers & Chem. Corp.*, No. 91 Civ. 2901, 91
Civ. 2902, 1996 WL 271789, at *4 (S.D.N.Y. May 21, 1996) (quoting *Greenspun
v. Lindley*, 369 N.Y.S.2d 123, 126 (1975)).

greatest interest in the specific issue under consideration."[67]

## 2. Fiduciary Duty Claim: Missouri Law

As discussed below, Missouri substantive law applies to the fiduciary

duty claim. Under Missouri law, "absent statutory authority, or an intentional or

fraudulent act, the relationship between a creditor and a corporation is that of

contract, not one of trust."[68]  Missouri "has rejected the concept that corporate

directors are fiduciaries for creditors, even in the event of insolvency."[69]  Missouri

does, however, recognize an exception to this rule when a corporation's acts with

regard to a creditor are fraudulent.[70]  Missouri law also recognizes an exception for

defunct or nearly-defunct corporations. "Early Missouri cases do recognize

directors' liability to creditors in the limited situation where the corporation is not

a going concern, but rather clearly going out of business or incapable of doing

---

[67]     *Caudle*, 2008 WL 4104035, at *6 (citation omitted). *Accord University of Montreal Pension Plan*, 446 F. Supp. 2d at 192 (noting that New York applies an interest analysis in order "to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that relate to the purpose of the particular law in conflict." (internal quotation and citation omitted)).

[68]     *Drummond Co. v. St. Louis Coke & Foundry Supply Co.*, 181 S.W.3d 99, 103 (Mo. Ct. App. 2005) (citation omitted).

[69]     *Id.* at 104.

[70]     *See Union Nat. Bank v. Hill*, 49 S.W. 1012, 1016 (Mo. 1899).

business, and that it is conclusively established that it is insolvent."[71]  Under these

cases, a corporation incapable of doing business was viewed as *"de facto*

dissolved, placing the directors and officers in a trustee-like position for the equal

benefit of all creditors."[72]

## IV.   DISCUSSION

### A.   Breach of Contract Claim

Koury agreed to sell his business to Xact, and to forego employment

in his field of expertise for three years, in exchange for sixty consecutive monthly

payments totaling over one million dollars.  Koury also agreed to enter into any

subordination agreements required by any of Xact's lenders.  As a result of

successive subordinations, Koury has not received any payments for one year and

has been prevented from obtaining employment in his field of expertise, leaving

him destitute.  Reading the factual allegations in the Complaint as a whole,

Koury's Complaint adequately pleads facts in support of three theories of breach.

### 1.   Fraud in the Inducement

---

[71]      *Drummond*, 181 S.W.3d at 104 (citing *Banta v. Hubbell*, 150 S.W.
1089, 1091-92 (Mo. Ct. App. 1912); *Warren v. Mayer*, 143 S.W. 861, 863-64 (Mo.
Ct. App. 1912); *Williams v. Jackson County Patrons of Husbandry*, 23 Mo. App.
132 (1886)).

[72]      *Drummond*, 181 S.W.3d at 104.

18

The Complaint adequately pleads facts in support of a claim for fraud in the inducement of the Amended Purchase Agreement. Koury signed the Amended Purchase Agreement on September 29, 2007. Koury alleges that on that date, Xact's counsel informed Koury that Commerce Bank had not yet decided to subordinate Koury's payments from Xact. The Amended Purchase Agreement similarly stated that Commerce Bank "may" subordinate Koury's payments, implying that the subordination had not yet occurred. Koury was informed on October 3, 2007, however, in a letter dated September 26, 2007, that Commerce Bank had subordinated his payments. Because a default by Xact on its loan from Commerce Bank automatically led to subordination under the Commerce Bank Subordination Agreement, and because Xact would have known whether it was in default on its loan with Commerce Bank, Koury has adequately pled that Xact knew, but failed to disclose and had represented otherwise, that Commerce Bank had subordinated Koury's payments *prior* to Koury's signing the Amended Purchase Agreement. Because there is, at the very least, a factual question regarding whether this alleged misrepresentation was material, Koury's claim for fraud in the inducement on the Amended Purchase Agreement may proceed.

## 2. Anticipatory Breach

The Complaint also adequately pleads facts in support of a claim for

19

anticipatory breach of the Amended Purchase Agreement. Some time after

December 11, 2007, Xact informed Koury that it would not pay Koury his monthly

installments unless and until he signed a new Subordination Agreement with M &

I Bank.[73] It appears that Xact's Superior Indebtedness to Commerce Bank ended

on December 10, 2008, when the refinancing with M & I Bank was completed.[74]

Thus, during the post-December 11 negotiations leading to the signing of the M &

I Bank Subordination Agreement, Xact was *not* restricted in any way from paying

Koury the amounts he was owed.

Xact argues, nevertheless, that its refusal to pay Koury during this

period unless and until Koury signed the M & I Bank Subordination Agreement

was not an anticipatory breach because the Purchase Agreement placed Koury

under a pre-existing legal duty to sign the M & I Bank Subordination Agreement.

Xact's argument fails, however, because Koury was under no legal obligation to

---

[73]     *See* Am. Compl. ¶¶ 39-41.

[74]     *See, e.g.*, M & I Sub. Ag. at 1 (indicating that loan date was
12/10/07). If, to the contrary, the Commerce Bank loan and Commerce Bank
Subordination Agreement were still effective on December 11, 2007, then Koury's
allegations support a claim for breach relating to the Commerce Bank
Subordination Agreement: Koury asked for Xact's financial records on December
11, 2007, which Xact refused to provide; by the terms of the Commerce Bank
Subordination Agreement, however, Koury was entitled to have access to Xact's
financial records "on a continuing basis." *See* Com. Bank Sub. Ag. at 2.

sign the M & I Bank Subordination Agreement: the Purchase Agreement provided that "Koury agrees to enter into any further subordination agreement *that may be required by any lender* of [Accurate Repro] and/or Xact."[75]  The M & I Bank Subordination Agreement was not "required by any lender"; rather, by its express terms, the M & I Subordination Agreement was "executed at [Xact's] request and *not at the request of Lender.* "[76]  Thus, Koury was under no pre-existing duty to sign this Subordination Agreement.  As a result, Koury's allegation that Xact threatened to cease performing on the Purchase Agreement unless Koury signed the M & I Subordination Agreement states a claim for anticipatory breach.[77]

### 3.    Good Faith

Both parties to the Purchase Agreement necessarily contemplated that Xact would take all reasonable care not to default on any loans that were subject to a subordination agreement with Koury.  Under the good faith doctrine in New York, this contemplated condition is an implied term of the Purchase Agreement.  According to the complaint, Xact violated this implied term by (1) manipulating

---

[75]     Am. Compl. ¶ 20 (emphasis added).

[76]     M & I Sub. Ag. at 2 (emphasis added).

[77]     The question of whether Koury's time to claim an anticipatory breach has expired turns on factual issues, including whether Koury had completed performance of his duties under the contract.

its financial data to obtain a loan for which it was not qualified; (2) agreeing to a loan with default conditions that it was likely to violate; or (3) manipulating its financial data to create the appearance of default with the intent of triggering a subordination. This allegation is made plausible by the pleaded circumstantial evidence, including: (1) Xact's refusal to disclose its financial records to Koury, even though the Commerce Bank Subordination Agreement and the first draft of the M & I Subordination Agreement required such disclosure; (2) Xact's default on the loan six weeks after it was issued; and (3) Xact's threat to cease performance on the Purchase Agreement unless Koury signed the M & I Subordination Agreement. To the extent the claim involves an allegation of fraud subject to a higher pleading standard, Koury has met that standard because the allegation relates to facts solely within Xact's knowledge, which Xact has refused to disclose, and Koury has alleged with particularity that Xact manipulated its financial records to create the appearance of default.[78] As a result, Koury is entitled to discovery on Xact's financial condition during the default period.

## B. Declaratory Judgment Claim

---

[78] *Cf. ATSI Commc'ns* at 102 (because a "claim of manipulation . . . can involve facts solely within the defendant's knowledge . . . at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain [fraud] claim.").

Koury argues that the Purchase Agreement is silent, and therefore ambiguous, on the effect of a subordination on the non-compete clause. Koury persuasively argues that it was not in the contemplation of the parties that Koury would receive no payments under the Purchase Agreement for two years and yet be precluded from holding a job during that period. Because the Purchase Agreement is silent on this topic, and evidence of industry practice and the parties' intentions may help illuminate the relationship between the subordination clause and the non-compete clause, the motion to dismiss Koury's declaratory judgement claim is denied.

### C.    Fiduciary Duty Claim

#### 1.    Choice of Law

Koury asserts that New York law should apply to his fiduciary duty claim,[79] while Xact, a Missouri corporation, argues that Missouri law should apply under the internal affairs doctrine.[80] The difference between applying New York law and Missouri law in this case would be substantial. Koury alleges that Xact owed a fiduciary duty to him because of insolvency, and New York holds the

---

[79]    *See* Pl. Mem. at 13.

[80]    *See* Defendants' Memorandum in Support of Its Motion to Dismiss ("Def. Mem.") at 9-10.

majority view that directors of an insolvent corporation owe a fiduciary duty to their creditors.[81] Missouri, on the other hand, "apparently is in a minority of states where internal duties of directors do not spread to duties to creditors."[82]

Koury argues that New York law should be applied due to its overriding interest in his fiduciary duty claim, yet the cases he offers in support of this argument are readily distinguishable. In *University of Montreal Pension Plan*, for example, this Court declined to follow the internal affairs doctrine and applied New York law to the directors and officers of hedge funds based in the British Virgin Islands.[83] One reason for applying New York law was that the funds' directors and officers allegedly allowed New York-based fund managers to perpetrate a substantial fraud on the funds' owners.[84] In addition, the funds were defunct at the time of the litigation.[85] As the defendant directors were no longer serving as directors, the internal affairs doctrine was no longer applicable, as its

---

[81]    *See Mediators, Inc. v. Manney*, No. 93 Civ. 2304, 1996 WL 554576, at *2-3 (S.D.N.Y. Sept. 30, 1996).

[82]    *Premier Bank v. Tierney*, 114 F. Supp. 2d 877, 887 (W.D. Mo. 2000) (citation omitted).

[83]    446 F. Supp. 2d at 194-95.

[84]    *See id.* at 193-94.

[85]    *See id.* at 194.

purpose is "to prevent a corporation and its current directors from being faced with conflicting demands."[86]  Here, by contrast, no alleged breach of fiduciary duty was planned or executed in New York, and Xact is not defunct, which means that the traditional purpose of the internal affairs doctrine continues to apply.

Koury also cites to *Stevens v. National Distillers & Chemical Corporation.*[87]  Notably, the defendant in that case was an insurance company incorporated in Kentucky.[88]  "As a foreign insurer doing business in New York, [it was] subject to various provisions of the New York Insurance Law," including certain fiduciary duty standards as codified in the New York Business Corporations Law."[89]  No such regulation exists here.

Ultimately, Koury's effort to establish that New York has an overriding interest in this matter is unconvincing.  The focus of this case is Koury's right to continue receiving payments under the Purchase Agreement in New Jersey, where he resides.  Moreover, applying New York law would put Xact in a very difficult position if it is insolvent.  Under New York law, the officers of

---

[86]    *Id.* (internal quotation and citation omitted).

[87]    1996 WL 271789 (S.D.N.Y. May 21, 1996).

[88]    *Id.* at *5.

[89]    *Id.*

Xact would be required to manage the company for the benefit of creditors. Yet Missouri law, which would continue to apply to the company's shareholders, would require Xact's directors to manage the company in the shareholder' best interest, over the interests of creditors. The internal affairs doctrine exists precisely to prevent such a conflict. Accordingly, Missouri law should govern Koury's fiduciary duty claim.

### 2.    Missouri Substantive Law

Under Missouri law, Koury's fiduciary duty claim cannot survive unless Koury adequately alleges that Xact engaged in fraudulent acts or that Xact was insolvent. Koury argues first that his fiduciary duty claim is viable under Missouri law because Xact committed a fraudulent act. Koury alleges that "[d]efendants failed to provide M & I with accurate financial statements in procuring Xact's loan"[90] and that Xact refinanced its debt "based upon misinformation and by hiding its true financial condition."[91] These allegations, even if true, do not describe a fraud directed *at Koury*. They are therefore insufficient to permit Koury to invoke the "fraudulent act" exception to the rule of *Drummond Company*.

---

[90]    Am. Compl. ¶ 44.

[91]    *Id.* ¶ 45.

Again relying on *Drummond*, Koury suggests in the alternative that Xact owes a fiduciary duty to him under the exception for companies that are "clearly going out of business or incapable of doing business."[92]  Koury has failed, however, to allege that Xact is incapable of doing business.  He simply asserts that Xact is "struggling."[93]  This characterization brings this case squarely within the ambit of *Drummond*.  The court wrote that "there was no evidence that St. Louis Coke was clearly going out of business, incapable of doing business, or not a going concern . . . . Instead, there was evidence that despite its financial difficulties, St. Louis Coke continued to sell coke" during the relevant period.[94]  Because Koury alleges neither that Xact committed a fraudulent act directed at him nor that Xact is incapable of doing business, his fiduciary duty claim is dismissed with leave to amend.

## V.   CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part.  A conference is scheduled for February 3, 2009 at 4.30

---

[92]   *Drummond*, 181 S.W.3d at 104.

[93]   Am. Compl. ¶ 50.

[94]   *Drummond*, 181 S.W.3d at 104.  Beyond its characterization of Xact as struggling, the Complaint gives no indication that Xact is incapable of doing business.

P.M.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              January 12, 2009

**- Appearances -**

**For Plaintiff:**

Seth T. Taube, Esq.
Maureen P. Reid, Esq.
Baker Botts L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
(212) 408-2500


**For Defendants**:

Michael A. Kalish, Esq.
Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177-1211
(212) 351-3738

29